Timothy GIEFFELS, Appellant,

v.

STATE of Alaska, Appellee.

No. 3258.

Supreme Court of Alaska.

Feb. 2, 1979.

See also 554 P.2d 460.

custodial parent would receive the same consideration.

Sue Ellen Tatter, Asst. Public Defender, Brian Shortell, Public Defender, Anchorage, for appellant.

David Shimek, Asst. Dist. Atty., W. H. Hawley, Jr., Asst. Atty. Gen., Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, BURKE and MATTHEWS, Justices.

## OPINION

BURKE, Justice.

On August 11, 1976, appellant Timothy Gieffels was convicted by a jury of manslaughter for the killing of Daniel Laughlin. In this appeal, Gieffels' major contentions are that the trial court erroneously refused to dismiss the indictment against him and to suppress certain key evidence, and that the trial court erred in its instructions to the jury.

The facts may be summarized as follows: On June 23, 1975, shortly before 6:30 a. m., Johnny Rochelle went to The Pines, an Anchorage nightclub, to cash a check. Roc-

helle found Daniel Laughlin, the bartender-janitor at The Pines shot through the head. It appeared that the deceased had been killed only a little while before Rochelle's arrival. It was later determined that the victim had been shot with his own gun, a .44 magnum Sturm-Ruger revolver. The owner of The Pines, Russ Pace, reported that $1,436.16 in cash was missing, including some $75.00 in silver dollars and half dollars.

While police were investigating the scene, Larry Turner, a Pines customer, arrived and informed them of his belief that Gieffels was responsible for the killing. Turner accompanied the police to Gieffels' home, and then to the Anchorage airport, where it was learned that Gieffels had taken the 8:30 a. m. flight to Seattle. Gieffels was subsequently tracked to California where he turned himself in about a month later.

Gieffels was indicted on counts charging first degree premeditated murder and felony murder.[1] Both of those charges were dismissed by the superior court for failure of the prosecution to present exculpatory evidence to the grand jury. Gieffels was then indicted for felony murder, but the indictment was again dismissed, this time on the ground that the prosecution had failed to show compelling reason for presenting hearsay evidence to the grand jury. That decision was affirmed by this court in State v. Gieffels, 554 P.2d 460 (Alaska 1976). In April, 1976, Gieffels was again indicted for felony murder. The trial court refused to grant a defense motion to dismiss the indictment.

There were no witnesses to the killing, but at Gieffels' trial there was substantial evidence linking him to the incident. Two customers of The Pines, Larry Turner and Jinx Hodges, testified that they had been there with Gieffels in the early morning hours before the killing and that Gieffels told them that he was going to rob the place if he had to kill someone to do it.

There was also testimony to the effect that Gieffels wanted the money so he could go to Oregon to see his child, who was living with his former wife, and that he was upset that he had not been able to see the child.

Donald Portnoy, a friend of Gieffels, living in Olympia, Washington, testified that Gieffels called him on June 23, 1975, and told him that he had gotten involved in a fight with a man in a bar in Anchorage, that the other man had pulled a gun, and that the next thing he knew, the other man was dead. Portnoy also testified that Gieffels said something about taking silver dollars on the spur of the moment, and that he was nervous because he had mentioned earlier in the evening that he might rob the place or do something to the other man.

Gieffels' brother, Jack, testified that Gieffels called him a day after the incident and told him that a man in a bar in Anchorage had pulled a gun on him, that they had wrestled a bit, and that the gun had gone off, killing the other man. Similar testimony was given by Gieffels' brother-in-law, a California police officer, to whom Gieffels eventually surrendered himself.

The prosecution also introduced a suitcase belonging to Gieffels which contained, among other things, fifty-two silver dollars, forty-eight half dollars, and 103 one dollar bills, one of which bore a palmprint of an employee of The Pines, blood stained clothing, and a .38 caliber revolver. A special agent of the FBI testified that hairs found on the victim's clothes matched a sample of Gieffels' hair.

The sole witness for the defense was Herbert L. MacDonnell, author of a report entitled "Flight Characteristics and Stain Patterns of Human Blood." Based on an analysis of photographs of the blood stains on the victim and at the scene, MacDonnell concluded that the victim's right arm had been near the wound in his left temple at

1. AS 11.15.010 provides:
   First degree murder. A person who, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate, rape, arson, robbery, or burglary kills another, is guilty of murder in the first degree, and shall be sentenced to imprisonment for not less than 20 years to life.

the time of impact, and, further, that the victim had been shot at a height of about fifty-three inches from the floor. This evidence was introduced to refute the prosecutorial contention that the victim had been shot while kneeling down in an attempt to open the floor safe in The Pines' office.

At the conclusion of the trial, over defense objection, the trial court instructed the jury on manslaughter as well as felony murder. The trial court also denied a defense motion to submit special findings to the jury. On August 11, 1976, the jury returned a verdict finding Gieffels not guilty of felony murder, but guilty of manslaughter. This appeal followed.

## I. The Grand Jury Proceedings

Appellant's first contention is that hearsay evidence was improperly presented to the grand jury that indicted him. The prosecution offered the hearsay statements of several witnesses: Dr. Donald Rogers, the pathologist who had performed an autopsy of the victim; FBI experts who had performed various blood, fiber and ballistics tests; and Johnny Rochelle, who had discovered the body. The statements of Dr. Rogers and the FBI agents were presented in the form of their written reports, while Rochelle's statement was one that he had given to police. Appellant contends that the use of this evidence was improper under Rule 6(r), Alaska R.Crim.P., and that therefore his indictment should have been dismissed. Criminal Rule 6(r) provides (emphasis added):

> *Admissibility of Evidence.* Evidence which would be legally admissible at trial shall be admissible before the grand jury. In appropriate cases, however, witnesses may be presented to summarize admissible evidence if the admissible evidence will be available at trial. *Hearsay evidence shall not be presented to the grand jury absent compelling justification for its introduction.* If hearsay evidence is presented to the grand jury, the reasons for its use shall be stated on the record.

■ We have carefully reviewed the transcript of the proceedings before the grand jury and hold that there was adequate evidence, apart from any hearsay presented, to support the indictment. Such being the case, the use of hearsay in violation of Criminal Rule 6(r) would not vitiate the indictment. *State v. Taylor,* 566 P.2d 1016, 1019 (Alaska 1977). However, since there was other evidence sufficient to support the indictment, we need not reach the issue of whether the hearsay evidence itself was improperly admitted. *Webb v. State,* 527 P.2d 35, 36 (Alaska 1974).

Appellant also argues that his indictment must be dismissed because the prosecution failed to present exculpatory evidence to the grand jury.

Alaska Criminal Rule 6(q) provides in pertinent part: "When the grand jury has reason to believe that other available evidence will explain away the charge, it shall order such evidence to be produced . . ." In *Johnson v. Superior Court of San Joaquin County,* 15 Cal.3d 248, 124 Cal.Rptr. 32, 539 P.2d 792, 796 (Cal.1975), the California Supreme Court held that when a district attorney is aware of evidence reasonably tending to negate guilt, he is obligated to inform the grand jury of its nature and existence. Basing its ruling on section 939.7 of the California Penal Code, which is worded virtually the same as Alaska Criminal Rule 6(q), the court reasoned that the grand jury cannot be expected to call for evidence of which it is kept ignorant. The court further explained that the statute served to reinforce the traditional function of the grand jury which is to stand between the prosecutor and the accused and to clear the innocent as well as to charge the guilty. *Id.* at 253, 124 Cal.Rptr. at 35, 539 P.2d at 795.

First, Gieffels asserts that the prosecutor failed to clearly inform the grand jury as to what type of bullet killed Laughlin. This argument is without merit as the evidence presented clearly showed that Laughlin was killed by a bullet from a .44 caliber revolver.

■ Second, Gieffels contends that the prosecution did not explicitly inform the

grand jury that the police had not taken a swab test of Laughlin's hands. A swab test might have indicated whether or not Laughlin had fired a gun and therefore whether he had in fact shot himself, or at least fired a shot which required Gieffels to respond in self-defense. We find this contention equally without merit. While we agree that a prosecutor is obligated to reveal any exculpatory evidence that he has, we do not perceive that duty as requiring him to report investigatory steps or procedures *not* taken.

Finally, Gieffels contends that exculpatory testimony from Johnny Rochelle was not presented. Gieffels does not, however, indicate exactly what Rochelle's exculpatory evidence would have been. Certainly, his eventual testimony at trial was not particularly exculpatory. A defense theory at trial was that Rochelle knew more about what had occurred than he admitted, but this theory was never substantiated.

■ For the above reasons, we conclude that there was no failure on the part of the prosecution to present exculpatory evidence to the grand jury; and that Gieffels, therefore, was not entitled to have his indictment dismissed upon such grounds.

## II. Search and Seizure of the Suitcase

At trial, the prosecution introduced into evidence a suitcase belonging to Gieffels which contained, among other things, bloodstained clothing and shoes, fifty-two silver dollars, forty-eight half dollars, and 103 one dollar bills, including one bearing the palmprint of an employee of The Pines. Appellant claims that the admission of the suitcase and its contents was error. He offers three theories in support of this contention.

On June 24, 1975, Gieffels called his brother Jack and requested that he pick up Gieffels' suitcase at the San Diego Airport. Jack was instructed to pick up the baggage claim check at a local bar, obtain the suitcase and hold it for Gieffels until he received further instructions. Jack, a naval

officer, had previously spoken to his brother and knew that he had been involved in a shooting in Alaska. He also knew that the suitcase contained a gun belonging to Gieffels and some money. Jack had already been contacted by the San Diego police who informed him that his brother was wanted in connection with a homicide and robbery in Alaska. He was also aware that two unmarked police cars had been stationed outside his home on the afternoon of the twenty-fourth.

On June 25, Jack called the police sergeant with whom he had spoken previously. He asked about the surveillance of his home and whether the police had any new information about his brother. At that time Jack informed the officer of Gieffels' request that he pick up the suitcase. The officer responded that it would be best if the police obtained the suitcase, so as to have the weapon in custody. Jack replied that he did not care if the police picked up the suitcase, because he did not want anything to do with it and did not want to go near it.

Without obtaining a warrant, the police then picked up the claim check from the bar where it had been left and claimed Gieffels' suitcase at the airport. They then opened the suitcase, after obtaining a warrant based on an affidavit by a San Diego police officer, Paul Ybarrando. The contents of the affidavit are discussed below. At the hearing on Gieffels' motion to suppress the evidence thus obtained, Jack repeatedly testified that his action was motivated by his desire not to be involved, that he did not wish to jeopardize his military career, that he was concerned for his brother's safety, that he wished to cooperate with the police, that if he had picked up the suitcase he might have gotten in trouble, and that the police would probably have gotten the suitcase from him anyway.

■ Appellant's first argument goes to the legality of the warrantless seizure of the suitcase.[2] It is well-established that

2. There is a question as to whether California or Alaska law is applicable here since the search and seizure of the suitcase occurred in California. However, we have found no signifi-cant difference between the pertinent law of the two jurisdictions and thus have considered the case law of both jurisdictions.

warrantless searches and seizures are *per se* unreasonable unless they fall within a recognized exception to the warrant requirement. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967); *Schraff v. State,* 544 P.2d 834, 838 (Alaska 1975). One such exception is that police officers may conduct a search or seizure without a warrant where a person with the requisite authority, be it the defendant or a third party, tenders a valid and voluntary consent to the search or seizure. *See, e. g., United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Robinson v. State,* 578 P.2d 141 (Alaska 1978); *People v. James,* 19 Cal.3d 99, 137 Cal.Rptr. 447, 561 P.2d 1135 (1977); *People v. Carr,* 8 Cal.3d 287, 104 Cal.Rptr. 705, 502 P.2d 513 (1972). Appellant contends that Jack's action in permitting the police to seize appellant's suitcase does not fall within this exception because Jack did not have the authority to consent to the seizure nor did he do so voluntarily.

■ Regarding Jack's authority to consent, it is appellant's contention that since Jack was a mere bailee, authorized only to hold the suitcase for appellant, he did not have the requisite authority to consent to its seizure.

In *United States v. Diggs,* 544 F.2d 116 (3d Cir. 1976), the court found a third party had authority to consent to a search under circumstances analogous to those in the case at bar. There the defendant's wife had left a locked box with her aunt and uncle, the Bradleys, for safekeeping, telling them that the box contained various stocks, bonds and other papers which were being kept for the children of the defendant and his wife. The Bradleys were not given a key to the box. Thereafter, the Bradleys heard that the defendant had been arrested for bank robbery. After a suspicious telephone conversation with his niece, Mr. Bradley remembered the box and he and his wife became increasingly distraught over the possibility that it contained stolen property. Accordingly, the Bradleys prevailed upon FBI officers to come to their house

and open the box. The officers did not have a warrant and opened the box with one of their own keys, finding some $17,080 in stolen cash inside.

Holding that the warrantless search of the locked box was permissible, a majority of the court reasoned:

> These facts when contrasted with those of the usual search and seizure case highlight the basic issue which confronts us, namely, which of two conflicting rights shall prevail, the right of the defendant owner to have the privacy of his property protected against a warrantless governmental search and seizure, or the right of the custodian into whose hands that property has been placed and who has been unwittingly involved by the defendant in his alleged crime promptly and voluntarily to exculpate himself by disclosing the property and his connection with it to government officers without requiring them to secure a search warrant.

544 F.2d at 119. Referring to an earlier case *United States v. Botsch,* 364 F.2d 542 (2d Cir. 1966), *cert. denied,* 386 U.S. 937, 87 S.Ct. 959, 17 L.Ed.2d 810 (1967), the court further stated:

> We are in agreement with the rule applied by the Court of Appeals for the Second Circuit in the *Botsch* case, namely, that the right of the custodian of the defendant's property who has been unwittingly involved by the defendant in his crime to exculpate himself promptly and voluntarily by disclosing the property and explaining his connection with it to government agents, must prevail over any claim of the defendant to have the privacy of his property maintained against a warrantless search by such agents.

*Id.* at 120–21.

There are factual distinctions between the instant case and *Diggs.* For example, Jack was not as insistent that the police intervene and take control of the evidence. However, we think the reasoning of the court in *Diggs* is nonetheless applicable

here. As Jack's testimony at the suppression hearing indicated, he was not a willing partner in his brother's plans. Such being the case, his right to exculpate himself and to avoid any possible involvement in the crime charged outweighed Gieffels' right to have the privacy of his property protected. Accordingly, we hold that Jack did have authority to permit the police to seize the suitcase.

■ This holding does not extend to Jack's authority to authorize a search of the suitcase. The third issue is not before us as the search itself was under the authority of a search warrant. Our decision is limited to a determination that one placed in a position of holding, for another, evidence which he reasonably believes is materially linked to a crime has the authority to disassociate himself from that evidence by voluntarily surrendering it to the police.

■ Appellant further contends, however, that Jack's authorization of the seizure was not voluntary. In determining whether a consent to a search or seizure is voluntary, the state has the burden of proving that such consent was a product of the person's free will and not the product of police coercion, either express or implied. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 863 (1973); *Sleziak v. State,* 454 P.2d 252, 257 (Alaska 1969); *People v. James,* 19 Cal.3d 99, 106, 137 Cal.Rptr. 447, 450, 561 P.2d 1135, 1138 (1977). Under federal and California law, voluntariness is a question of fact to be determined in light of all the circumstances. *Schneckloth,* 412 U.S. at 229, 93 S.Ct. at 2048, 36 L.Ed.2d at 864; *James,* 19 Cal.3d at 106, 137 Cal.Rptr. at 450, 561 P.2d at 1138. We have held that there must be clear and convincing evidence that the consent was unequivocal, specific, and intelligently given. *Sleziak,* 454 P.2d at 257.

■ We conclude that Jack's consent to the police seizure of the suitcase was voluntary. There is little doubt that at the time Jack felt the pressure of circumstances, for he found himself, through no wish of his own, at the center of a murder investigation. As appellant notes, Jack felt that he might have gotten in trouble had he picked up the suitcase himself. The record shows, however, that Jack freely telephoned the police and informed them of the suitcase appellant had left for him and that when the police suggested that it would be best for them to obtain the suitcase, Jack readily agreed. Thus, it is quite apparent that Jack's concern for his career and his desire to disassociate himself from the whole matter was his primary motivation for consenting to the seizure by the police. Taking Jack's testimony as a whole, we think that such consent should be attributed to Jack's common sense rather than taken as evidence that he was in any way coerced by the police into consenting.

■ Finally, contrary to appellant's suggestion, we do not believe that the failure of the police to advise Jack that he could refuse consent made his consent less free and voluntary.[3] It was Jack himself who telephoned the police and informed them of the suitcase. Only at this point did the police suggest that they should obtain it.

For the above reasons, we hold that Jack Gieffels had the authority to consent to a seizure of the suitcase and that he did so voluntarily.[4]

We turn now to a consideration of the validity of the warrant upon which the search of the suitcase was based. As noted above, the search warrant was issued on the basis of an affidavit by a San Diego police officer, Paul Ybarrando. The essential in-

---

**3.** Appellant does not contend that the police need advise persons in all circumstances that they may refuse to consent to a search and seizure.

**4.** Appellant also asserts that the bartender holding the claim check had no authority to surrender it to the police. We find this contention without merit in view of Jack's authority to pick up the claim check and thereby obtain possession of the suitcase.

formation contained in the affidavit was given to Ybarrando by other police officers, primarily from Anchorage, and was as follows: that a robbery and murder had occurred in Anchorage; that the suspect had been identified as Timothy Gieffels and a warrant had been issued for his arrest; that Gieffels had fled Alaska, eventually arriving in San Diego; that John Gieffels had informed the police that Timothy Gieffels' suitcase containing a .38 weapon was at the airport; that Ybarrando obtained the suitcase at the airport; that the victim was believed to have been shot by a .44 caliber weapon; that about $2,000 in currency was taken in the robbery; and "that a witness, identified as Larry Turner, was present in the establishment at or near the time of the shooting and identified Timothy Gieffels as the person responsible."

Appellant contends that Ybarrando's affidavit was insufficient to establish probable cause because it did not demonstrate the reliability of either Larry Turner or Turn-

er's statement and further that the statement misrepresents the facts. Accordingly, Gieffels asserts that Turner's statement must be excised from the affidavit and that absent that statement, the affidavit does not provide a connection between Gieffels and the crime such as to establish probable cause to search his suitcase.

■■■ We agree with appellant that Larry Turner's statement must be excised from Officer Ybarrando's affidavit. Even if we accord Turner's statement the deference given to information from "citizen informers,"[5] we find that on its face the affidavit fails entirely to establish the reliability or credibility of either Turner or his information and that the magistrate thus was not entitled to rely on such information.[6] However, even without Turner's statement, we find that there was sufficient other information linking Gieffels to the crime to establish probable cause to search his suitcase. The affidavit stated that Gieffels had been identified as a sus-

**5.** As a general rule, hearsay statements contained in affidavits may form a basis for a finding of probable cause only where the affidavit shows that the informant's information was based on personal knowledge and that the informant was credible or his information reliable. *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Davis v. State,* 499 P.2d 1025 (Alaska 1972), *rev'd* on other grounds, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *People v. Hamilton,* 71 Cal.2d 176, 77 Cal.Rptr. 785, 454 P.2d 681 (1969). Where information is provided by private citizens as opposed to police informers, however, somewhat different considerations apply. In *Erickson v. State,* 507 P.2d 508 (Alaska 1973), we held that probable cause to arrest may be based on information provided by "citizen informers" without establishing the prior reliability of such informers. The rationale is that such informers, unlike police informers, generally act with an intent to aid the police in law enforcement and it is difficult to prove their reliability since they usually provide information only once. We added, however, that some of the details of the information must be verified before arrest occurs. 507 P.2d at 517–18. Under similar reasoning, California law also gives greater deference to the reliability of citizen informers. *People v. Hill,* 12 Cal.3d 731, 757, 117 Cal.Rptr. 393, 413, 528 P.2d 1, 21 (1974); *Krauss v. Superior Court of San Joaquin County,* 5 Cal.3d 418, 96 Cal.Rptr. 455, 487 P.2d 1023 (1971). However, the reliability of the information still must be shown, *i.*

*e.,* the information provided must be factual and not conclusionary and there must be some showing that the informer speaks from personal knowledge. *Krauss,* 5 Cal.3d at 421–22, 96 Cal.Rptr. at 457–58, 487 P.2d at 1025–26.

Even if Turner is considered a citizen informer, we do not find his statement to have sufficient indicia of reliability to establish the asserted fact that appellant was responsible for the crimes under California or Alaska law. First, the affidavit does not clearly establish that Turner spoke from personal knowledge ("a witness, identified as Larry Turner was present in the establishment at or near the time of the shooting"). In fact, Turner was in his apartment at the time of the shooting. Second, Turner's statement is conclusionary and is not supported by specific facts ("[Turner] identified Timothy Gieffels as the person responsible.").

**6.** California law provides that where it is determined that a magistrate relied on unreliable hearsay statements in an affidavit, these statements must be excised and the sufficiency of the affidavit tested by consideration of only the remaining portions. *People v. Hill,* 12 Cal.3d 731, 759, 117 Cal.Rptr. 393, 414, 528 P.2d 1, 22 (1974); *Theodor v. Superior Court of Orange County,* 8 Cal.3d 77, 101, 104 Cal.Rptr. 226, 243, 501 P.2d 234, 251 (1972). We have also indicated that this is the proper approach. *See Davenport v. State,* 515 P.2d 377, 380 (Alaska 1973).

pect in the case and that a warrant had been issued for his arrest; in addition it stated that Gieffels had fled Anchorage by plane approximately two hours after the estimated time of the robbery and killing. That · a warrant for Gieffels' arrest had been issued in itself provided a key link between Gieffels and the crime, and this information in combination with the fact of flight was such that the magistrate could reasonably find probable cause to believe Gieffels was linked to the crime in Anchorage. As appellant has not otherwise challenged the validity of the search warrant, we thus conclude that the search of his suitcase pursuant to the warrant was lawful.

### III. Jury Instructions and Special Findings

Appellant next contends that the trial court erred in (1) giving a manslaughter instruction as a lesser included offense of felony murder, because there was no evidence presented to support a manslaughter instruction; (2) submitting the manslaughter instruction that it did; and (3) failing to submit special findings to the jury.

■ Appellant's first contention, that a manslaughter instruction was not warranted in this case as a lesser included offense of felony murder, is without merit. In *Gray v. State,* 463 P.2d 897 (Alaska 1970), a case which also involved a homicide linked to a robbery, we stated:

> [F]elony murder under Alaska law is a purposeful killing committed in the perpetration of certain felonies. Such a purposeful killing if not done in the perpetration of one of the enumerated felonies, may constitute second degree

murder. *Such a killing if done in the perpetration of a felony but not with specific intent to kill, may be manslaughter.* Thus depending on the facts of a given case both second degree murder and manslaughter could be lesser included offenses to first degree felony murder.

*Id.* at 906 (footnote omitted; emphasis added). Here, while there was certainly ample evidence from which it could have been inferred that Gieffels had committed a robbery at The Pines and had shot Laughlin, there was still room for a reasonable doubt whether he acted with the requisite intent to kill. Thus, we are satisfied that a manslaughter instruction was fully warranted.

■ Appellant next argues that the manslaughter instruction that was given was erroneous. We decline to rule on this issue because the defense failed to raise such an objection in the court below. Rule 30(a), Alaska R.Crim.P.[7] Furthermore, having examined the instructions given, we do not find that the asserted error constitutes "plain error" within the meaning of Alaska R.Crim.P. 47(b)[8] so that we should rule on it despite the failure to raise a timely objection below.

■ Appellant's final contention is that under *Gray v. State,* 463 P.2d 897 (Alaska 1970), the trial court erred in refusing to require special findings by the jury. Appellant's reliance on *Gray* is misplaced. There, one of the defendants was convicted of two counts of first degree murder, one based upon felony murder, and the other upon a theory of premeditation. The other defendant was convicted of both felony murder and second degree murder. Each defendant was sentenced to two concurrent terms of life imprisonment, although only one man had been killed. We held that since

> [t]he main purpose of [this] rule is to require errors to be drawn to the attention of the trial court in time for their correction so as to avoid the inconvenience and expense of a new trial. Another reason is to obviate the temptation to save defenses for the purpose of obtaining a new trial on appeal.

7. Criminal Rule 30(a) provides in pertinent part:

> (a) *Requested Instructions—Objections. .  .* No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objections.

As we stated in *Dimmick v. State,* 449 P.2d 774, 776 (Alaska 1969) (footnote omitted),

8. Criminal Rule 47(b) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

there had been only one death, multiple convictions for first degree murder were improper, saying:

> We believe it is sound to allow multiple theories [of murder] to be presented to the jury and not to force the jury to choose between them. However, this effect can be achieved by the use of special findings, rather than multiple convictions for one crime. The jury can be told that the accused is charged with one crime, first degree murder. The jury can be asked to enter findings which would show whether the murder was a felony-murder, or a premeditated one or both. Also by the use of findings on the elements of the offense, guilt on lesser included offenses can be ascertained at the same time. . .
>
> The use of special findings is preferable to allowing multiple convictions or requiring the jury to choose between theories.

*Id.* at 911. As can be seen from the above, our ruling in *Gray* applied where two alternate theories of first degree murder were presented, rather than, as here, where the jury could find only a lesser included offense.[9] There is nothing in *Gray* or the Rules of Criminal Procedure which requires the submission of special findings in a case such as this.[10] While such findings might have been useful in ascertaining the reasoning behind the jury's verdict, we think that the decision of whether or not to ask for them was a matter left to the discretion of the trial court. Finding no abuse of discretion, we conclude that the trial court did not err in failing to require special findings by the jury.

We have considered appellant's other grounds for appeal, and find them wholly without merit. The judgment of the superior court is AFFIRMED.

---

**9.** While the original Gieffels' indictment, which was dismissed, charged both first degree premeditated murder and felony murder, the indictment on which he was tried was for felony murder only.

**10.** Rule 31(e), Alaska R.Crim.P., does require that the jury make special findings in certain situations not present here.