**Barry NIX, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 5481.**

Court of Appeals of Alaska.

Nov. 5, 1982.

---

Michael J. Lindeman and Joseph A. Kalamarides, Settles, Kalamarides & Associates, P.C., Anchorage, for appellant.

Charles M. Merriner, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

Barry Nix was convicted of the unlawful entry into the homes of three Anchorage women (respectively J.B., L.O.M., and C.P.) with the intent to rape them, former AS 11.20.080; the resulting rape of two of the women, J.B. and C.P., former AS 11.15.-120(a)(1); and the assault of the third, L.O.M., former AS 11.15.230. All of the cases were tried together and he was acquitted of the burglary and rape of T.C. He received sentences which totalled fifty years' imprisonment, when taking into account those to be served consecutively, and including sentences which we approved in *Nix v. State,* 624 P.2d 825 (Alaska App. 1981). He appeals, challenging both his

convictions and the length of the sentences imposed.

 His primary contention on appeal[1] is that the trial court erred in denying his motion to sever the various counts, so that each victim's case could be separately heard. He also contends that separate grand juries should have heard the facts regarding each victim prior to returning an indictment. In connection with this argument he claims that the trial court also erred in permitting the jury to hear evidence regarding an alleged burglary of the residence of S.C. and an assault on S.C. for which Nix was separately tried and convicted. *See Nix v. State,* 624 P.2d 823 (Alaska App.1981).

The Alaska Supreme Court has addressed contentions similar to Nix's in two cases which we find controlling: *Stevens v. State,* 582 P.2d 621 (Alaska 1978) and *Coleman v. State,* 621 P.2d 869, 874 (Alaska 1980), *cert.*

*denied,* 454 U.S. 1090, 102 S.Ct. 653, 70 L.Ed.2d 628 (1981).

In *Stevens,* two rape charges involving separate victims were joined together for purposes of trial. The supreme court noted that two or more offenses may be joined in the same indictment under Criminal Rule 8(a)[2] if either (a) they are of the same or similar character or (b) they are based on the same transaction. *Stevens* involved the joinder of similar offenses and the court indicated concern that such a joinder could prejudice a defendant: a jury might be more willing to convict a defendant despite reasonable doubts regarding one of the offenses if they were convinced beyond reasonable doubt that he had committed other like offenses. Consequently, the court suggested that where joinder was predicated on the basis of "same or similar character" offenses only, the trial court should on motion grant a severance. 582 P.2d at 629.[3]

---

1. Nix's other claimed errors and our dispositions are as follows:

 Nix contends that his indictment should have been dismissed because an insufficient number of grand jurors participated. Specifically, he notes that AS 12.40.020 requires between 12 and 18 jurors on a grand jury, and that only 12 heard his case. Finally, he contends one of those 12 should have been disqualified for bias since he or she (the grand juror) knew L.O.M., one of the victims. The juror denied any prejudice when questioned. Consequently, we conclude an insufficient showing of bias has been made. 1 C. Wright, *Federal Practice and Procedure: Criminal 2d* § 102, at 203–04 (1982). In any event the record reflects that "a majority of the total number of grand jurors, after deducting the number not legally qualified, concurred in finding the indictment." Alaska R.Crim.P. 6(f). Under these circumstances we find no error.

 Nix also argues that the trial court should have suppressed evidence of his head and pubic hairs allegedly obtained as a result of an illegal search and seizure. The trial court heard testimony regarding this issue and after evaluating the credibility of witnesses, concluded that there was neither express nor implied police coercion and that Nix gave an unqualified and unequivocal express and intelligent consent to the search. The trial court's decision is supported by substantial evidence and is therefore not clearly mistaken. *See Gieffels v. State,* 590 P.2d 55 (Alaska 1979).

2. Criminal Rule 8(a) provides:

 *Joinder of Offenses.* Two or more offenses may be charged in the indictment or information in a separate count for each offense if the offenses charged, whether felonies, misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

3. The court relied *inter alia* on Criminal Rule 14 which provides:

 If it appears that a defendant or the state is prejudiced by a joinder of offenses or defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires. In ruling on a motion by defendant for severance the court may order the attorney for the state to deliver to the court for inspection in camera any statements or confessions made by the defendants which the state intends to introduce at the trial.

 We recognize that *Stevens* is ambiguous on this point, admitting of two contradictory interpretations. The first we have adopted and set out in the text: A defendant's right to an automatic severance of similar character offenses for trial depends on a finding that evidence of one or more of the offenses would not be admissible at the trial of the other offenses. If evidence of an offense would not come in under Alaska Rules of Evidence 403 and 404 at the

The court concluded that Stevens was not entitled to a severance of the two rape charges because the circumstances surrounding the two events were sufficiently similar that evidence regarding each was relevant and admissible in the other case to show the common identity of the assailant. In the context of that case it is therefore clear that this right to an automatic severance depends upon a further determination by the court that evidence of each separate incident would not be admissible under Alaska Rules of Evidence 403 and 404 in the trial of the others.

Consequently, we must determine whether evidence regarding the attack on each of Nix's alleged victims would have been ad-

missible in the trial of each of the other charges if the charges had been separately tried. If there was common admissibility, then the trial court did not err in denying the motion for severance. Conversely, if evidence of one or more of the offenses could not have been admitted in a trial of the other offenses, then Nix suffered error. A reversal is mandatory if the error was prejudicial.

The rules governing the admissibility of evidence of other incidences of rape to show the common identity of the assailant are thoroughly canvassed in *Coleman v. State,* 621 P.2d 869 (Alaska 1980), *cert. denied,* 454 U.S. 1090, 102 S.Ct. 653, 70 L.Ed.2d 628 (1981).

trial of another charge it cannot be joined with that charge at trial over defendant's objection.

Nix suggests an alternate reading of *Stevens* based upon the following dicta:

> Despite the foregoing, we think it appropriate to note our agreement with the criticism which has been directed against a procedural rule which permits the joinder of offenses of the same or similar character. We think that in general such joinders are to be avoided and that in those instances where the prosecution has joined offenses of the same or similar character the court, on motion by the accused, should grant a severance of such changes [sic].[36]
> [36]. ABA Standards Relating to Joinder and Severance, § 1.1(a) and § 2.2(a), at 28–32 (1968).

582 P.2d at 629 (footnote omitted).

The ABA Standards cited grant a defendant an automatic severance whether or not there is cross-admissibility. This right to an automatic severance has been carried over in the ABA Standards for Criminal Justice Standards 13–2.1 and 13–3.1(a) (Severance of Offenses) (1980). *See* respective commentary. Thus, Nix argues, while the rule we adopt was used by the supreme court in deciding the case before it in *Stevens,* the court in dicta prospectively adopted a rule of automatic severance based on the standards. Nix concludes, therefore, that he had an automatic right to severance since his case was tried after the *Stevens* case, and the denial is prejudicial *per se.* We reject this interpretation of *Stevens.* Alaska Criminal Rule 14 clearly gives the trial court discretion, where similar character offenses are joined, to grant or deny a severance based upon a showing of prejudice. As the commentary to the standards points out, there is little risk of prejudice:

> Similar character offenses normally involve the repeated commission of the same offense often with the same modus operandi. With

respect to this one kind of unrelated offense, evidence of each offense is normally admissible as "same crimes" evidence at the trial of the others. Therefore, the joint trial of the offenses avoids the duplication of evidence, reduces the burden on victims and witnesses, and generates other economies. At the same time, separate trials of the offenses would not minimize problems of the weight of accusation and cumulation of evidence, because the "other crimes" evidence would be before the jury. As a result, the joint trial of similar character offenses may often be desirable.

2 ABA Standards for Criminal Justice, Commentary to Standard 13–2.1 (2d ed. 1980) (citations omitted).

Thus, if Nix is correct the supreme court's *Stevens* dicta eliminated trial court discretion over severances and thereby amended Criminal Rule 14. *Stevens* was decided in 1978, however, and no amendments to the rule have been recorded in the intervening four years.

Finally, had the supreme court intended to eliminate considerations of prejudice in prospectively mandating reversal where motions to sever were denied, we believe the court would have clearly articulated that rule in its opinion. Furthermore, even if we agreed with Nix's interpretation of *Stevens,* we would find any error in denying him an automatic severance harmless beyond reasonable doubt. First, the evidence of each offense with the exception noted would have been admissible at the trial of every other offense under Alaska Rules of Evidence 403 and 404. Second, the jury demonstrated an ability to distinguish between the offenses by acquitting Nix of the rape of T.C. despite substantial similarities between the assault on T.C. and the other assaults.

Given the uncertainty regarding the supreme court's intent in *Stevens* we would nevertheless urge trial courts to automatically grant severances hereafter at least until the supreme court clarifies its intent.

■ Having carefully reviewed the record in light of the *Coleman* and *Stevens* decisions, we have concluded that there was sufficient similarity between each of the five incidents introduction of evidence regarding each case in the trial of each of the others was not prejudicial error. Consequently, we affirm the decision of the trial court. The following facts establish the context in which this issue must be decided.

## J.B.

J.B., a young Caucasian woman, was attacked in her street-level apartment located on the west side of Anchorage at approximately 9:15 p.m. on January 11, 1979. She testified that her assailant knocked at her door. Expecting a friend, she opened the door and the assailant forced his way in. She described him as a white male with a slim build, approximately 5'8" to 6' tall, wearing a light beige nylon stocking over his face as a mask. He was also wearing dark heavy gloves and a nylon coat. He subjected her to vaginal intercourse from front and back and forced her to perform fellatio. He repeatedly threatened to "blow [her] away" or "slice [her] up" if she looked at him, so she kept her eyes shut. When he left he made her lie on her stomach on her bed with her head in a pillow. The FBI lab matched hair samples taken from Nix to hair found on J.B.'s pillow. Chemical analysis of seminal fluid on J.B.'s panties indicated that her assailant was a man with blood group type "B," the blood type of approximately ten percent of the population. Barry Nix has blood group type "B." Nix was convicted of the burglary and rape of J.B.

## T.C.

T.C., a young Caucasian woman, was attacked in her basement apartment located on the east side of Anchorage near the intersection of Bragaw and Debarr Roads, a few miles from J.B.'s residence, on January 17, 1979 at approximately 8:30 p.m. She described her assailant as white, wearing a dark stocking mask, white cotton gloves stained with brown paint, and a dark jack-et. She described him as approximately 6' tall with a slight build, weighing about 145 pounds. He told her to keep her eyes closed or he would "blow [her] head off" or "blow [her] away." He subjected her to vaginal intercourse and cunnilingus and forced her to perform fellatio. T.C. was able to identify Nix's voice. Sperm swabbed from her vagina during the medical examination following her attack showed that her assailant had blood group type "B." Nix was acquitted of the rape and burglary of T.C.

## L.O.M.

L.O.M., a young Caucasian woman, was attacked in her street-level apartment located on the west, side of Anchorage, approximately four blocks from J.B.'s apartment, at approximately 10:40 p.m. on January 27, 1979. Her assailant was neither masked nor gloved. She described him as white, between twenty-two and twenty-six years old, approximately 5'8" to 5'11" tall, wearing a blue down parka. The assailant came to her door, and when she opened it, forced his way in and beat her about the body with his fists. When he heard one of the children who was sleeping in the next room cry out, he panicked and fled. She positively identified Nix as her assailant at a lineup and later at trial. Nix was convicted of the burglary and assault on L.O.M.

## C.P.

C.P., a young Caucasian woman, was attacked in her street-level apartment located on the west side of Anchorage, approximately thirteen blocks from J.B.'s apartment and twelve blocks from L.O.M.'s apartment, at approximately 11:30 p.m. on January 30, 1979. She told the police that her assailant was thin, weighing 135 to 150 pounds, between 5'8" and 6' tall, wearing a beige-brown ski mask and cowskin-like gloves. She was not able to tell his race. He rang her bell and when she answered forced his way in, spun her around, blindfolded her, propelled her into the bedroom and there tied her hands behind her back. He told her if she screamed she would "get

it" or be "blown away." He attempted vaginal intercourse but when she told him she was menstruating, forced her to perform fellatio. He then forced her to lie face down on her bed with a pillow over her head while he escaped.

Shortly before the attack, C.P. had come home from the hospital where she worked. She noticed a quite dirty white or off-white late sixties model Dodge or Plymouth sedan, which she believed was following her. When the police investigated C.P.'s complaint, they found tire marks in the snow near her apartment showing an unusual pattern: three snow tires and a summer tire on the left front.

C.P. testified that while her assailant was assaulting her, he spilled semen on her comforter. Her comforter was chemically analyzed for semen stains which indicated that the semen came from a man with blood group type "B."

Nix was convicted of the burglary and rape of C.P.

### S.C.

S.C., a young Caucasian woman, lived in a trailer located in a trailer park on the west side of Anchorage approximately nine blocks from C.P.'s residence, five blocks from L.O.M.'s residence, and six blocks from J.B.'s residence. On February 2, 1979, after celebrating her birthday at a local restaurant, S.C. and a friend, Russell Sell returned to her trailer at approximately 1:00 a.m. She found her door partially open and defendant Barry Nix, whom she had not previously met, asleep in a chair in her front room. She looked around the front room and discovered it had been ransacked. She became quite agitated, woke Nix up demanding to know who he was and why he was in her front room. When he proved unresponsive, she called the police and her landlord. She then went into her bedroom and found her drawers pulled out and her personal belongings scattered about the room. She specifically noticed that someone had taken her babydoll pajamas and suggestively laid them out on her bed. It looked like someone had been lying on the bed. She returned to the front room and again accosted Nix, at which point he jumped up, struck her in the chest, and fled the room. Sell and S.C.'s landlord gave chase and were able to run Nix down. They returned him to the trailer and kept him there until the police arrived to arrest him.

When arrested, Nix was wearing brown cotton gloves and a blue coat. He had a pair of white cotton painter's gloves in his pocket and he had a dark pair of nylon panty hose with the ends snipped off concealed on his person.

Nix's vehicle was found parked approximately 150 feet from S.C.'s trailer. The vehicle was a quite dirty 1967 white Dodge Polara two-door sedan. The vehicle had two snow tires on the rear, one snow tire on the right front and a summer tire on the left front. When the vehicle was searched, some cut-off women's nylons were found in the back seat and some shoelace-type cord, similar to that used to tie T.C., was also found in the back seat.

C.P. identified Nix's vehicle as the one she had seen following her on the day she was attacked. Nix was separately prosecuted for the unlawful entry of S.C.'s apartment and his assault upon her. He was convicted. *Nix v. State*, 624 P.2d 823 (Alaska App.1981). We affirmed his convictions for assault and unlawful entry but vacated a burglary conviction on the ground that the indictment insufficiently alleged burglary.

Evidence of other crimes is governed by Alaska Rule of Evidence 404(b) which provides:

> *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove a character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

██ Evidence of prior crimes is by its very nature potentially prejudicial, particu-

larly where the crimes alleged are sexual. Therefore, such evidence must be carefully evaluated before it is admitted. *Coleman v. State,* 621 P.2d at 874. This is especially true where the evidence is offered solely to prove the "identity" of the defendant as the perpetrator of the charged offense. *Stevens v. State,* 582 P.2d 621, 628 n. 31 (Alaska 1978).

Nevertheless, we believe that the evidence in each of the five cases was sufficiently similar and sufficiently unusual, when viewed in its totality and in the common pattern it presented, to constitute a *modus operandi* probative of Nix's being the assailant in all instances. *Coleman,* 621 P.2d at 875.

To briefly review the evidence, Nix was arrested at S.C.'s residence in the early morning hours on February 2, 1979, wearing white cotton gloves and a blue jacket with a cut-off woman's stocking in his pocket capable of being used as a mask. Parked nearby was his dirty, white Dodge vehicle with its distinctive tire arrangement. He is 5'11" tall, Caucasian, of medium build, and weighs 150 pounds. He thus fits the description given by each of the victims, his automobile matches the description given by C.P., and his tire arrangement corresponds to the tire prints found by the police outside C.P.'s apartment. S.C. is a young Caucasian woman. All of the other incidences involved victims who were also young Caucasian women. S.C. lives on the west side of Anchorage in the Turnagain area within a five block radius of J.B., L.O.M. and C.P. Only T.C. lived outside of the Turnagain area. (Nix was acquitted of the charges involving T.C.) All of the incidents took place within a sixteen-day period, between 8:30 p.m. and 1:00 a.m. (the record does not indicate how long Nix had been in S.C.'s trailer before she returned). Nix was caught in S.C.'s trailer. All of the other victims described their assailant as between 5'8" and 6' tall, with a slim build, weighing between 135 and 150 pounds. Nix fits this description. All of the victims except C.P., who could not tell, described their assailant as being white. Nix is white. Finally, J.B. and L.O.M. identified the blue parka that Nix was wearing at S.C.'s trailer as similar to the one worn by their attacker. T.C. described a similar garment but was unable to positively identify Nix's coat as the one worn by her assailant. J.B., T.C. and C.P. were subjected to similar sexual attacks. Finally, Nix and the assailant of J.B., T.C., and C.P., had blood group type "B," a characteristic shared by only ten percent of the population.

Of these cases the two weakest connections are T.C. (for whose rape and burglary Nix was acquitted by the jury) and L.O.M., who was not raped and whose assailant was not masked or gloved. On balance, we believe the court should have severed L.O.M.'s case. Nevertheless, L.O.M.'s attacker was similar in appearance to Nix, and her attack occurred in the same geographical area within two weeks of the other incidents and at approximately the same time during the night. Finally, since Nix aborted his attack on L.O.M., the other incidents were relevant to show his intent in entering her apartment as well as his identity. Given the substantial evidence connecting the assaults of J.B., T.C., and C.P., it is unlikely that evidence of the assault on L.O.M. significantly affected the jury's consideration of those other cases.

T.C. described her attacker in almost identical language to that used by J.B. and C.P. The primary difference was that her attack took place a few miles away from the others outside the Turnagain area. Nix was acquitted of the rape and burglary of T.C., which indicates that the jury was able to separately consider the facts regarding each case. Given the substantial similarities between the attack on T.C. and the attacks on J.B. and C.P., the trial court did not abuse its discretion in admitting the evidence surrounding that attack in conjunction with the evidence of the other cases. Accordingly, the trial court did not abuse its discretion in denying the motion to sever the various charges. Further, given the substantial evidence connecting Nix with each of the incidents, we conclude that the court could properly decide that the

relevance of the evidence in establishing Nix's identity as the common assailant outweighs any prejudicial impact. Alaska R.Evid. 403. Finally, we believe that the same grand jury properly heard all of the cases together.

## SENTENCE APPEAL

Nix's convictions and sentences were as follows: (1) raping J.B. (fifteen years); (2) burglarizing J.B.'s residence with the intent to rape her (ten years concurrent with the fifteen-year rape term); (3) burglarizing L.O.M.'s residence (ten years); (4) assaulting L.O.M. (six months concurrent with the ten-year burglary term); (5) raping C.P. (fifteen years); and (6) burglarizing C.P.'s residence (ten years concurrent with the fifteen-year rape term). Nix received a total sentence of forty years. (Fifteen, ten and fifteen). These sentences were also made consecutive to sentences totalling approximately ten years, affirmed in *Nix v. State,* 624 P.2d 825 (Alaska App.1981), so that Nix faces approximately fifty continuous years imprisonment.

Nix was born illegitimate on May 25, 1958; he never knew his father. In the following years his mother married almost eight times and, in addition, lived with a number of men without marrying them. Nix's early life was consequently chaotic. He was alternately abused and neglected by his mother and her succession of paramours. His most frequent homes were apparently the bars his mother frequented. In August of 1970, at the age of twelve, Nix was first declared a delinquent for running away from "home." He remained in state custody, alternately residing at McLaughlin Youth Center and the Alaska Psychiatric Institute until December of 1970. He was accused of trying to burn down the latter establishment during his stay. He was released on a brief pass to his mother for the Christmas holidays and she absconded with him and her other children to Hawaii with her then current companion. The next nine months which Nix, his mother, her children, and her paramour spent in Hawaii were relatively uneventful except Nix tells us his

mother's companion raped Nix's older sister. Thereafter, Nix spent the bulk of his adolescence fluctuating between McLaughlin Youth Center and the Alaska Psychiatric Institute. He was adjudicated delinquent on November 8, 1971 for two counts of petty larceny: (1) theft of a .22 automatic rifle from Mt. View Sporting Center; and, (2) theft of a leather jacket from Brewster's Department Store. He was released from McLaughlin July 30, 1973. He remained free from juvenile detention for seven months but was thereafter placed in custody for running away from a further placement. He was released in June of 1974 and reincarcerated in November of 1974 for petty theft. He escaped in February of 1975 and was reincarcerated in March of 1975, in the interim having been convicted in a juvenile proceeding of two counts of burglary not in a dwelling. He escaped again in September of 1975 and was found with a stolen gun. He was reincarcerated and remained at McLaughlin Youth Center until May 26, 1976, when, having reached the age of eighteen, he was released as an adult.

As an adult he accumulated the following record: (1) June 30, 1976, joyriding and fleeing the police; (2) August 10, 1976, concealment of merchandise; (3) September 8, 1976, burglary in a dwelling (his first adult felony); (4) March 28, 1978, petty larceny (a .22 semi-automatic pistol); and (5) April 1978, receiving and concealing stolen property (Nix's second adult felony).

▆▆▆▆ All of Nix's offenses currently under consideration took place prior to the effective date of our new criminal code. Thus, its sentencing requirements are not binding. *Sundberg v. State,* 652 P.2d 113 (Alaska App., 1982) (*Sundberg* II). Nevertheless, the new code is highly persuasive as a recent expression of legislative intent. *Whittlesey v. State,* 626 P.2d 1066, 1068 (Alaska 1980). As a third felony offender under the new code, Nix would have been subject to a presumptive term of fifteen years for each of his rapes, AS 11.41.410(b), AS 12.55.125(c)(3), and a presumptive term of six years for each of the corresponding burglaries, AS 11.46.300(b), AS 12.55.-125(d)(2).

When we remember that Nix's extensive juvenile record included burglary convictions and that his first adult felony was a burglary conviction, the trial court's decision aggravating his current burglary sentence from six to ten years would not appear "clearly mistaken." *See McClain v. State,* 519 P.2d 811 (Alaska 1974). The burglary sentences are reasonable, at least to the extent that they were made to run concurrently to the rape and assault sentences imposed. *See Davis v. State,* 635 P.2d 481, 488 (Alaska App.1981). Nor do the rape sentences viewed in isolation appear unreasonable. *Id.* at 487–88.

The problem presented by this case consists in pyramiding consecutive sentences to a total of fifty years incarceration. At the time Nix received the rape and burglary sentences under consideration, his probation had been revoked on two earlier convictions. Judge Lewis had given him three years to serve for petty larceny and Judge Carlson had given him seven years to serve consecutive to Judge Lewis' sentence for burglary in a dwelling. In *Nix v. State,* 624 P.2d 825, 826 n. 2 (Alaska App.1981), we affirmed these consecutive sentences. In addition, Nix was facing a consecutive ten-year sentence imposed by Judge Moody for the burglary of S.C.'s residence and the assault upon her, which were separately tried. We vacated this last sentence in *Nix v. State,* 624 P.2d 823 (Alaska App.1981); *see also Nix v. State,* 624 P.2d at 827. Consequently, disregarding the sentences imposed by Judge Moody for the crimes against S.C., Nix, at the age of twenty-four, faces a total sentence of forty years, consecutive to the consecutive seven and three-year sentences imposed respectively by Judges Lewis and Carlson, for a total sentence of fifty years to serve.

Judge Ripley specifically found that three reasons made consecutive sentences necessary in this case: (1) to vindicate the need to isolate Nix, a dangerous offender, to deter him and others similarly situated, and to affirm community norms; (2) to adequately punish Nix, a member of the class of worst offenders under the *Wortham* test (*see State v. Wortham,* 537 P.2d 1117, 1120 (Alaska 1975)); and, (3) to adequately respond to Nix's psychological profile compiled from reports accumulated over nine years during which juvenile and adult institutions attempted Nix's rehabilitation. Nix's psychological evaluation identified him as extremely dangerous. We believe these fact-findings are supported by the record and meet the requirement that consecutive sentences not be imposed unless the court specifically finds that confinement for the full aggregate term was actually necessary to protect the public. *Lacquement v. State,* 644 P.2d 856 (Alaska App.1982).

Our conclusion that Nix's individual sentences were appropriate, and that this case warranted consecutive sentences does not, however, completely resolve the problem presented. We must evaluate the aggregate sentence against a claim of excessiveness. We conclude that the total sentence was not clearly mistaken given the number of Nix's victims and the length of his criminal record. However, the trial court committed clear error in making the sentences imposed in this case consecutive to the sentences previously imposed. There is nothing in the record which supports a finding that potential incarceration of forty years would not adequately protect the public.[4]

The judgment of the superior court is AFFIRMED in part and REVERSED in part. The sentence is VACATED and the

---

4. In *State v. Wortham,* 537 P.2d 1117, 1120 (Alaska 1975), the supreme court disapproved a sentence because it was not made consecutive to an earlier sentence for a separate crime. Neither sentence was a maximum for the offense in question. Where a defendant receives a maximum sentence for the most serious of two or more offenses, we have held that no

additional sentence may be made consecutive unless the additional time is found to be necessary to protect the community from further criminal activity by a defendant. The record in this case will not support a total sentence in excess of forty years. *Lacquement v. State,* 644 P.2d 856 (Alaska App.1982).

case REMANDED to the superior court to impose a new sentence concurrent to the ten years previously approved in *Nix v. State,* 624 P.2d 825 (Alaska App.1981).

BRYNER, Chief Judge, concurring and dissenting.

In *Stevens v. State,* 582 P.2d 621 (Alaska 1978), the supreme court established a rule based on the ABA Standards Relating to Joinder and Severance, §§ 1.1(a), 2.2(a). This rule permits a defendant an automatic severance at his election where offenses are initially joined solely on the basis that they are of the same or similar character. I do not believe the supreme court's intention is in doubt or that the language it chose to express that intention in *Stevens* is ambiguous. The court elected to apply that rule prospectively and not to allow Stevens to benefit from it. Nevertheless, it is clear that the rule was to apply to subsequent cases such as Nix's. I believe that the supreme court's holding in *Stevens* is binding on this court and feel compelled to follow it.

I agree that evidence of each of Nix's assaults was cross-admissible except evidence of the assault on L.O.M. I also agree that Nix has not demonstrated prejudice from the joinder. Nevertheless, it seems reasonable to assume that the supreme court adopted a *per se* rule in *Stevens* simply because it feared subtle prejudice from joinder that could never be demonstrated to the extent necessary to overcome a harmless error rule. Consequently, I believe we are precluded by *Stevens* from applying a harmless error test in this case. I would therefore reverse Nix's conviction and grant him new trials on his separate rape and burglary convictions.

In all other respects I join in the court's decision.