**UNITED STATES of America**

v.

**Fred Lee JONES.**

**Crim. No. 76–148.**

United States District Court,
W. D. Pennsylvania.

April 22, 1977.

220

James J. West, Pittsburgh, Pa., for plaintiff.

Mark S. Frank, Pittsburgh, Pa., for defendant.

## OPINION

COHILL, District Judge.

Fred Lee Jones was found guilty by a jury of bank robbery and of assaulting and jeopardizing the lives of two tellers by use of a dangerous weapon, in violation of 18

U.S.C. §§ 2[1] and 2113(a) and (d).[2] Three other individuals, Larry Eggleston, Richard McIntosh and Tyrone Jones, indicted as co-defendants, entered guilty pleas to the charges. Defendant has filed a motion for judgment of acquittal, or, in the alternative, for a new trial.

We deny the motions.

## I

### The Facts

On May 27, 1976 at approximately 11:00 A.M. the South Side office of the Peoples Bank of Western Pennsylvania, New Castle, Pennsylvania, was robbed of $7451.00 by four black males.

The testimony at the trial revealed that at approximately 10:40 A.M. on the day of the robbery, Larry Eggleston, Richard McIntosh and two other men went to the home of one Dan Briggs in New Castle. Briggs's younger brother, Sherdell, knew Eggleston and McIntosh, let them in the door and talked with them for about ten minutes. Eggleston and McIntosh had occasionally stayed at the Briggs residence. Ten minutes later, at approximately 10:50, the four men left, telling Sherdell Briggs to leave the door unlocked for them if he left the house. The men departed in a 1970 4-door Buick Electra 225, light green with a dark top.

A clothing store owner across from the bank saw a man (later identified as Tyrone Jones) enter the bank. He also saw a full-sized American car, light green in color, moving slowly in the direction of a stoplight beyond the bank, and saw two other men walk up to the bank from the same direction, look in, walk past it, return, then approach and make "some hand sign or something" to the green car. The two men then went to the bank's door, held it open and shortly thereafter a man ran out of the bank carrying a gun and a satchel.

Tyrone Jones had entered the bank armed with a sawed-off shotgun and robbed the tellers. The tellers, who testified they feared for their lives, placed the money in a briefcase which was identified at trial. The loot included "bait money" which, when removed from the cash drawer, tripped the surveillance camera causing it to photograph the robbery.

A witness who lived four doors away from the bank had seen three men "hanging around" a corner on an empty lot near the bank. Two of them wore hats which reminded her of "J. J. on Good times." Half an hour later she saw two of them running across lot, one carrying a briefcase; they jumped into a 2-door big light green American car that came up to them, halted, and then sped away. She did not see the driver.

Shortly after 11:00 A.M., a witness several blocks away observed a light green 1970 4-door Buick Electra 225 with a dark top speeding along a city street and through an intersection red light.

At approximately 11:20 A.M. Sherdell Briggs was sitting on the front porch of his brother Dan's house. The light green 1970 Buick Electra which Sherdell had seen his visitors enter half an hour earlier pulled up to the house. The driver was in the front seat and the three other individuals were lying down in the back seat; they crawled out from the back seat carrying a briefcase and a sawed-off shotgun and went into the

---

**1.** 18 U.S.C. § 2 provides:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

**2.** 18 U.S.C. § 2113 provides in part:

"(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

\* \* \* \* \* \*

(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device . . ".

Briggs' house. Sherdell recognized them as the men who had visited him earlier. At the trial he identified the driver as Fred Lee Jones, and indicated that Jones was wearing tie-dyed blue jeans and a multicolored silk T-shirt.

Being apprehensive, Sherdell left the house immediately. He met a relative, Andrew Lockett, and told him about the strange happenings. The two men drove to another part of town where they learned that the Peoples Bank had been robbed. Lockett dropped Sherdell off in another part of town, then drove by the Briggs' house and noticed the light green car parked in front.

Meanwhile, Dan Briggs and his wife returned home from grocery shopping shortly before noon. The light green car was no longer parked in front of their house. Dan unloaded the groceries, after which the three men in the house (Eggleston, McIntosh and Tyrone Jones) prevailed upon him to take them to a bus station. The three gathered their belongings, including paper bags and a laundry bag containing something and put them into Briggs's car. Briggs did not think anything to be out of the ordinary.

Dan Briggs was stopped by Trooper John W. Hudson of the Pennsylvania State Police for a traffic violation (passing a truck in a no-passing zone) while he was taking the three men to the bus station. Trooper Hudson had heard the robbery had been committed by four black males and asked the occupants of the car for identification. Only Briggs and McIntosh had any. Hudson then requested that they follow him to a state police barracks for questioning in connection with the bank robbery.

Upon arriving at the barracks the four were escorted inside and asked for further identification. All of the men (including Briggs) were placed under arrest when Trooper Hudson made a visual inspection of the inside of the car and saw a brown bag that contained considerable amount of money. He also saw a wad of bills stuck in the back seat. This testimony was adduced at the suppression hearing.

They were advised of their constitutional rights and searched for weapons. During the weapons search a wad of bills totaling some $500 and a Peoples National Bank money wrapper were found in the side of McIntosh's sock. Following this discovery and the arrival of an FBI agent and a New Castle policeman, Dan Briggs consented to a search of his automobile and executed a written waiver. Detective Ronald S. Williams found $3500 in a paper bag and money stuffed behind the front passenger seat and in the back seat of the car. FBI Agent Oliver H. Hunter opened the trunk in Briggs's presence and found the laundry bag. After Briggs indicated that the bag belonged to one of the other three, Agent Hunter opened it and found a sawed-off shotgun hidden among the clothes. Briggs denied any knowledge of the robbery, the money or the shotgun.

Briggs was released a short time later. Prior to his release he had consented to a search of his home and again signed a waiver. The agents searched Briggs's home at 5 or 6 P.M. that day. They recovered several articles of clothing belonging to some of the men and the briefcase taken from the bank.

Meanwhile, Officer Vincent Russo of the New Castle Police had heard the police radio broadcast following the robbery and had set up an observation post at the intersection of Routes 18 and 108, 1–1½ miles from the bank in hopes of intercepting the robbers. He was on the lookout for a late model Buick, light green with a dark top. He saw such a car at approximately 11:45 A.M. with one occupant and followed it. Before stopping the car, he radioed the license plate registration number to the police dispatcher and learned that the car was registered to one Fred Lee Jones from Pittsburgh, the defendant herein.

Officer Russo stopped the car and asked the driver for identification. The driver was Fred Lee Jones. He asked Jones to step out of the vehicle and then asked whether he could look in the trunk; Jones consented and the officer found nothing of import. The officer also looked in the car windows and saw several cassette tapes on

the back seat and two one-dollar bills lying on the floor. Jones explained the bills by saying that he must have dropped them.

The officer further noted that Jones had on a pair of tie-dyed blue jeans and a multi-colored silk body shirt. He recalled the car as being a 1968 to 1970 Buick 4-door Sedan with a light green body and dark vinyl top. The driver had been cooperative throughout the officer's inquiry, explained his presence in New Castle by indicating that he was lost and searching for Aliquippa and was permitted by the officer to continue on his way.

At trial Officer Russo identified the driver as the defendant, Fred Lee Jones. It was stipulated that Fred Lee Jones owns a 1969 Buick Electra 225. Officer Russo's uncontradicted testimony established that the car has four doors and is light green with a dark green vinyl top.

Sherdell Briggs testified that an acquaintance of his, who also lived in New Castle, had a 1970 green Buick Electra 225. Briggs maintained that this car had Ohio license plates, was battered and rusted, and was not the one he had seen on the day of the robbery.

At the suppression hearing Sherdell Briggs testified that he did not know Fred Lee Jones at the time of the robbery. He also testified that about four days after the robbery, from a photograph, he identified Fred Lee Jones as the driver. The procedure followed by the police in obtaining this photo identification did comport with the standards of due process established by *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and their progeny.

The Peoples Bank of Western Pennsylvania in New Castle is insured by the Federal Deposit Insurance Corporation.

## II

### *Jury Verdict*

█ The test to apply in a motion for judgment of acquittal is whether, viewing the evidence in the light most favorable to the government, a reasonable-minded jury could conclude from the admissible evidence that the defendant is guilty beyond a reasonable doubt. *United States v. Peterson,* 166 U.S.App.D.C. 75, 509 F.2d 408 (1974); *United States v. Kohlmann,* 491 F.2d 1250 (5th Cir. 1974); *United States v. Hopkins,* 354 F.Supp. 634, (E.D.Pa.1973); see also *United States v. Brawer,* 482 F.2d 117 (2d Cir. 1973), cert. denied on appeal after remand 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1974); and *United States v. Ehrenberg,* 354 F.Supp. 460 (E.D.Pa.), aff'd 485 F.2d 682 (3d Cir. 1973), cert. denied 416 U.S. 906, 94 S.Ct. 1612, 40 L.Ed.2d 111 (1974).

█ We hold that the evidence and testimony outlined above was sufficient to support the conclusion, beyond a reasonable doubt, that the defendant, Fred Lee Jones, participated in the bank robbery as the driver of the get-away car.

## III

### *The Stopping of the Briggs Car*

Defendant assigns error to the court's refusal to suppress evidence uncovered by the search of Daniel Briggs's automobile, asserting that the stopping of Briggs's car by a state trooper and the subsequent searches of the car, which yielded a sawed-off shotgun and money, were unlawful. Defendant contends that the state policeman had no probable cause to stop Briggs.

The state trooper, John W. Hudson, testified in the suppression hearing that he had heard via police radio that the bank had been held up by four black males and that one of the robbers had worn a golf cap. He set up an observation post to watch cars leaving the city on Route 422, a major artery. At approximately 12:30 P.M., the Briggs car passed him with its four black male occupants, one of whom was wearing a golf cap. He followed the car for a quarter of a mile or so, then saw the driver pass a truck in a no-passing zone and pulled the car over for the traffic violation. He approached the car, asked the occupants for identification, and noticed a golf cap on the

rear seat. When only two of the occupants could produce identification, he radioed for a more detailed description of the bank robbers. He learned that one of the robbers had an earring in his ear and noticed that one occupant, Richard McIntosh, wore an earring. The officer then requested Briggs and the others to go to the state police barracks for further questioning about the robbery.

We might agree with defendant's contention that the presence of four black males, one wearing a golf cap, driving together in a car bearing no resemblance to that connected with the robbery, would not constitute probable cause for an investigatory stop. Whatever the officer's suspicions, however, he made the stop only after Briggs committed a traffic violation, passing a truck in a no-passing zone. At the trial Briggs admitted the violation.

In the course of a routine traffic stop, after two occupants could not produce identification and after seeing the hat which had been on one of the occupants now lying on the seat, the officer radioed for a description of the bank robbers. He noted the earring and concluded that under all of the circumstances these four were possibly involved. He did not search the car at that time other than to observe what was in plain view. He requested Briggs to drive the car to the state police barracks for further inquiry concerning the bank robbery, which Briggs, by his own testimony, voluntarily did.

■ Under these circumstances, we find that probable cause existed for the officer to stop the car and then to request Briggs to go to the barracks.

## IV

### The Search of the Briggs Car

Defendant objects to the search of the laundry bag in the trunk of Briggs's car and to a search of the paper bag containing money which allegedly occurred before Briggs gave his consent.

Testimony in the suppression hearings and at trial indicated that upon arrival at the police barracks Trooper Hudson looked into the car and saw a brown bag on the floor of the front passenger side. He said the bag "looked ; . . to contain a considerable amount of money." He also saw "a wad of bills in the back seat, stuck there". The four men then were frisked for weapons and were asked to produce identification. The weapons search revealed a large sum of money and a money wrapper from Peoples National Bank stuffed in the side of McIntosh's sock.

After this discovery, Briggs was asked if he would consent to a search of his car. He did so without hesitation and signed a waiver. The search of the passenger compartment revealed money hidden between the seats and a paper bag containing $3,500. Search of the trunk revealed the laundry bag which contained the shotgun.

Defendant contends that, Briggs, as owner of the car, did not have authority to consent to a search of the laundry bag which belonged to one of the other men. The government contends that defendant does not have standing to raise the issue or to complain of the search of Briggs's car.

In *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), the court held that a defendant does not have standing to contest a search and seizure where the defendant (a) is not on the premises at the time of the contested search and seizure, (b) alleges no proprietary or possessory interest in the premises and (c) is not charged with an offense that includes as an essential element possession of the seized evidence at the time of the contested search and seizure. Here the defendant does not meet any of these criteria.

■ Defendant was charged in the second count of the indictment with endangering the lives of the bank tellers by use of a dangerous weapon. He is *not* charged with an offense in which possession *at the time of the seizure* is an essential element but is charged with an offense in which possession at *an earlier time* is an essential element. We hold that petitioner had no standing to contest the search of Briggs's trunk and the laundry bag.

Defendant also urges that Briggs's consent to search the trunk did not extend to items which did not belong to him, such as the laundry bag. Persons who are unwittingly thrust into the role of a participant in criminal activity may consent to a search of items which have been placed in their safekeeping in order to exculpate themselves from the alleged crime. *United States v. Diggs,* 544 F.2d 116 (3d Cir. 1976).

Thus, the circumstances of this search must be considered. The search of the car trunk and laundry bag occurred at the police station after the occupants of the car were arrested and after the weapons frisk had yielded a wad of bills and the money wrapper from the recently robbed Peoples National Bank. Dan Briggs, the owner of the automobile had consented to the search. When the laundry bag was discovered in the trunk, the agent lifted the bag and became suspicious because it was unduly heavy. He removed some clothing from the bag and found the sawed-off shotgun. Briggs said that he knew nothing about the bag or the gun.

It has been said that "searches conducted outside the judicial process, without prior approval by judge or magistrate are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One such exception involves the warrantless search of automobiles, although the word automobile is "not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge v. New Hampshire,* 403 U.S. 443, 461–462, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564 (1971).

█ Unlike in the search of a home, probable cause can justify warrantless searches of automobiles for evidence of crimes. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Chambers v. Maroney,* 399 U.S. 42, 62 n. 7, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (concurring opinion of Justice Harlan); *Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975). However, certain factors must be present such as concern over the threat of destruction to suspected contraband or over the mobility of the vehicle. A search conducted at a police station is as great an intrusion as the concededly permissible course of holding the vehicle until probable cause can be determined by a magistrate. See *Chambers v. Maroney,* 399 U.S. at 46–52, where the court upheld the search of a car driven to a police station after defendant had been arrested.

█ Consent to a search is recognized as an exception to the warrant and probable cause requirements of the Fourth Amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Consent to search is not lightly to be inferred, and the government has the burden of proving that consent was freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. at 548–549. We conclude that the evidence here clearly establishes Briggs's voluntary and knowing consent to the search of his automobile, even though Briggs consented only after his arrest. See *Carpenter v. United States,* 463 F.2d 397 (10th Cir.), cert. den. 409 U.S. 985, 93 S.Ct. 337, 34 L.Ed.2d 251 (1972).

We are faced here with a situation similar to that addressed by the court *en banc* in *United States v. Diggs, supra.* Briggs's legitimate interest in exculpating himself from suspicion must be balanced against the expectation of privacy to be protected on behalf of the unidentified owner of the laundry bag. The circumstances of this case do not allow rote application of the principles that can be garnered from the plurality opinion in *Diggs*; in that case the possessor of the small metal box frantically pleaded with the authorities to open the box and indicated that he would open it if they did not. In determining this balance we note *United States v. Bussey,* 507 F.2d 1096 (9th Cir. 1974), wherein the court pointed out that the consent of a participant in an attempted bank robbery to a search of the motel room where the group was staying was valid as to the common areas but did

not extend to the defendant's personal luggage.

We conclude that the search and discovery of the sawed-off shotgun was within the parameters of the Fourth Amendment. Briggs's interest in exculpating himself, his control over the car, his consent, the officer's suspicion arising from the heavy weight of the laundry bag, the presence of money in the seats of the auto, in a bag in the front seat, and the discovery of money and a moneywrapper in McIntosh's sock prior to the search all tilt the scales in favor of the legitimacy of the search.

Defendant also asserts prejudicial error in the discrepancy between the testimony of Dan Briggs and that of Officer Hudson concerning the paper bag full of money later found in the car. Defendant relies upon Dan Briggs's statement that when he saw the bag prior to the stop by Officer Hudson it was closed. On the other hand, Officer Hudson stated during the suppression hearing that when he looked in the car after it had arrived at the barracks the bag was open and he could see a considerable amount of money. We refused to reopen suppression hearing testimony to examine further the possibility that the officer conducted a warrantless search of the car before Briggs consented. We conclude that the defendant does not have standing to assert the Fourth Amendment rights of the occupants of the car. Under *Brown v. United States, supra,* lack of standing on this point is based upon defendant's denial of any possessory interest in the money, his absence from the scene at the time of the search, and inconsequence of possession of the money as an element of the offense of bank robbery. We do not need to inquire further into the evidentiary basis for this argument.

## V

### *The Stop by Officer Russo*

■ Defendant maintains that evidence of the stop of his automobile by Officer Russo on the day of the robbery should have been suppressed and all reference to his identification by the officer during the stop withheld from the jury. He was stopped by Officer Russo and then permitted to go on. Defendant's argument presumes an illegal stop of his automobile. The evidence reviewed in Section II above establishes that the stop was not illegal. Officer Russo stopped defendant's light green vehicle upon the basis of information he received over the radio describing the car involved in the robbery. The stop was made after the officer ascertained that the automobile belonged to Fred Lee Jones, a resident of Pittsburgh. Under these circumstances, the officer was justified in making an investigatory stop to ascertain the driver's identification.

The defendant at all times cooperated during the stop—he freely answered questions concerning the robbery (maintaining his innocence), even voluntarily consented to open his car trunk, and was finally allowed to go on his way. We conclude, therefore, that the stop was an investigatory stop, that the facts warranted this intrusion, and that the scope of the intrusion was reasonably related to the circumstances justifying the interference in the first place. *United States v. Collins,* 532 F.2d 79 (8th Cir.), cert. den. 429 U.S. 836, 97 S.Ct. 104, 50 L.Ed.2d 102 (1976); *United States v. Harris,* 404 F.Supp. 1116 (E.D.Pa.1975). If defendant's Fourth Amendment rights were not violated, and we hold they were not, there is no merit to defendant's assignment of error to the court's denial of his motion to amend the motion to suppress so as to include Officer Russo's testimony and identification of defendant.

Defendant also asserts that he was denied a fair trial by the government's failure to make known to his attorney prior to trial the contents of a statement defendant made when he was stopped by Officer Russo. He had explained his presence in the New Castle vicinity by indicating that he was trying to get to Aliquippa but was lost. Defendant's attorney maintains that Fed.R. Crim.P. 16 has been violated, thereby prejudicing his presentation of the case.

■ Counsel asserts that the statement was made without the defendant having

been given his *Miranda* rights and therefore was made in violation of his constitutional rights. The statement was given under circumstances which did not indicate an arrest or custodial interrogation; therefore *Miranda* does not apply. *Steigler v. Anderson*, 496 F.2d 793, 798–800 (3d Cir.), cert. den. 419 U.S. 1002, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974).

The government maintains that defendant's attorney was well aware, or should have been aware, of the existence of the explanatory statement prior to trial. While we can find nothing in the record to support the government's contention that it informed the defendant's attorney of the statement prior to trial, we note that the statement did come out at trial and that the government explained that it fully believed the defendant's attorney was apprised of the statement before the beginning of the trial.

In examining the "penalty" provisions of Rule 16 the court

"may order such party to permit the discovery or inspection, grant a continuance or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances."

We do not see how the admission of defendant's explanatory statement, to explain his presence in the area, prejudiced his presentation of the case. The rule specifically provides that as a remedial measure the court, in its discretion, may order the discovery or inspection of the statement at the time its existence becomes known to the court. We cannot conclude that this asserted violation of Rule 16 had any prejudicial impact against the defendant. See also the recent opinion in *United States v. Kaplan*, No. 76–1179, 554 F.2d 577 (3d Cir. April 11, 1977).

## VI

### Conclusion

After thoroughly reviewing all of the points raised by defendant, we find no reason to set aside the verdict of the jury.

An appropriate order will be entered.