589 A.2d 59

**Lenard Bernard OWENS**

v.

**STATE of Maryland.**

**No. 103, Sept. Term, 1990.**

Court of Appeals of Maryland.

April 29, 1991.

Bradford C. Peabody, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief), Baltimore, for petitioner.

Sarah E. Page, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ., and MARVIN H. SMITH and CHARLES E. ORTH, Jr., Associate Judges of the Court of Appeals (retired), Specially Assigned.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

Marla Gardin, a friend of Lenard Bernard Owens, permitted him to leave his luggage in her apartment. The luggage was a nylon bag with a zipper closure. The police, without a warrant, seized the bag in Owens's absence and searched it. They found crack cocaine and a large sum of cash. Owens was charged in the Circuit Court for Washington County with various violations of the controlled dangerous substances laws. He filed a pretrial motion to suppress the evidence, and, after a plenary hearing, the motion was denied. A jury convicted him of possession of cocaine with the intent to distribute. The court imposed a sentence of imprisonment for a term of 20 years and ordered him to pay a fine of $10,000 and $280 costs. The judgment was affirmed by the Court of Special Appeals. *Owens v. State,* 83 Md.App. 353, 574 A.2d 362 (1990). We granted Owens's petition for the issuance of a writ of certiorari.

## I

We glean the details of Owens's misadventure from the proceedings at a hearing on the pretrial motion to suppress the evidence. Testimony was received from Owens, Gardin, and Nelson Morgan Sheppard, Jr., a detective with the Hagerstown Police Department, experienced in the investigation of drug violations.

We learn from Owens that he was a resident of Fort Pierce, Florida, and made frequent trips to Hagerstown, Maryland. On six or seven occasions he stayed at Gardin's apartment. He characterized his relationship with Gardin as "[j]ust another person that I know, a friend." He came to Hagerstown from Florida on 31 January 1988, accompanied by several other men. This time, however, he went to the home of another friend, "Miss Elizabeth," whose last name he did not know, intending to stay there while in Hagerstown. He left his bag there. He asked Gardin to get the bag and take it to her apartment. He said he made the request so he could change to clothing that was in the bag. He did not give Gardin permission to open the bag, he "simply asked her to bring it over to her house." He spent the night of 31 January 1988 in Gardin's apartment because it was too late to go to Miss Elizabeth's house. He did not have a key to Gardin's apartment, and she let him in when he knocked on the door. He spent the night on a sofa in the living room. When Owens departed the apartment the next morning, he left the bag in the living room with Gardin's permission, intending to pick it up "later on whenever I had time to." The bag's zipper was closed, and he insisted that he never gave Gardin "permission to go into [his] luggage or open it in any way, shape or form." A luggage tag bearing his name and address was attached to the outside of the bag. He "gave [Gardin] some money for staying there, like I gave her money to buy some needs for her and the kid. I mean, as far as paying, I gave her money to go buy breakfast."

Gardin testified at the call of the State. She was the listed tenant of the premises, paying a monthly rental of $37 (she was on public assistance). She lived there with her two-year-old daughter. On 1 February 1988, Owens and several other men, some of whom were known to her from previous visits, arrived at her apartment with three pieces of luggage. Owens and one of the men had spent the night there before, as recently as two weeks ago, but this time they did not indicate that they intended to spend the night. "They said they was going to leave, could they leave their bags 'cause they was going to look for a room and I said yes." After they left, the police came to her apartment and asked if they could search it. She had no objection and told them so. She executed a form by which she acknowledged her awareness of her constitutional rights, consented to the search of her apartment, and authorized the police to "take from my premises and property any ... things which they desire as evidence for criminal prosecution in the case or cases under investigation." The document was received in evidence. The pieces of luggage brought by Owens and his companions were in the living room. She did not point them out to the officers—"they were setting right there for them to see them." The police searched the apartment and the luggage with her permission. Owens's bag was closed. She had not opened it; Owens had not given her permission to open it. Gardin denied that she had brought any of the pieces of luggage to the apartment.

Sheppard testified on behalf of the State. He and other officers went to Gardin's apartment, without a search warrant, on 1 February 1988. Gardin answered the door. Sheppard identified himself and

indicated to her that [he] had received information that there were drugs in her apartment that was brought there by four subjects who just arrived there that morning.

She stated that she had no problem with the police coming in and searching the house. She executed a consent to search form. She then

> pointed to some luggage which was located on the southwest corner of the living room and she stated "they had just brought it here this morning and if there's any drugs it would be in there." I then asked her who "they" was and she related to me that there were four black males, Nard [Owens], Wink, Waddell and the fourth one was a new guy that she didn't know his name.

She did not "indicate at any time that any of those individuals had spent the preceding day or night there," but she acknowledged that all except "the new guy" had been there on prior occasions. A search of the bag with Owens's name tag on it revealed two pairs of "tube" socks stuck into shoes. Inside the socks were plastic bags. One bag contained 436 pieces of crack; another 246 pieces of crack; another 291 pieces of crack, for a total of 325.79 grams. In a fourth sock was $1880 in United States currency, in denominations not smaller than $20. Sheppard summed up what he alleged Gardin had told him:

> Basically the only thing was that she told me that they had come to the apartment that morning after they had just arrived from Florida, and her response also was that they would come to her apartment when they would come to town to sell crack, oftentimes leaving some in her apartment, but oftentimes taking it out on the street with them.

It was elicited from Sheppard that crack is usually not sold by the gram on the street but in $20 "pieces." Now, he explained, "with the way the weight has been fluctuating, [the value] will run between $78,000 and $97,000 for that package."

II

A

Owens's motion to suppress was founded on the Fourth Amendment to the Constitution of the United States, which is applicable to state prosecutions under the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961). The Fourth Amendment has two parts. First, it guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Second, it provides that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." The Supreme Court

> has interpreted the Amendment to include the requirement that normally searches of private property be performed pursuant to a search warrant issued in compliance with the Warrant Clause.

*Arkansas v. Sanders,* 442 U.S. 753, 758, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (1979).

> In the ordinary case, therefore, a search of private property must be both reasonable and pursuant to a properly issued search warrant. The mere reasonableness of a search, assessed in the light of surrounding circumstances, is not a substitute for the judicial warrant required under the Fourth Amendment.

*Id.* Thus, the Supreme Court has made clear that a search or seizure conducted without the benefit of a warrant supported by probable cause is per se unreasonable under the Fourth Amendment, subject only to a few jealously guarded and carefully drawn exceptions. *Gamble v. State,* 318 Md. 120, 123, 567 A.2d 95 (1989).

## B

The judge hearing the motion found that no one but Gardin had a proprietary interest in the apartment. She had the "exclusive and sole right in that apartment respecting the Fourth Amendment rights." He found that Gardin gave the police officers permission to search the premises and that the consent was valid. Noting that "[b]asically the Fourth Amendment is a personal right," he likened Owens's leaving the bag in Gardin's apartment to a "gratuitous bailment." The judge observed:

[T]he fact that these [men] who apparently come up here from Florida and flop their suitcases down in Miss Gardin's apartment without any arrangements whatsoever, they have no interest in that apartment, no proprietary interest whatsoever, and they flop their suitcases in there and then just go off, intending to return hours or days later, does not give them any Fourth Amendment right to challenge the search of her apartment. She is the person and the sole and exclusive person who could grant consent to search that apartment under the evidence presented.

The judge opined:

The Fourth Amendment and legitimate expectation of privacy was in the area searched and the person who had a reasonable expectation of privacy was Miss Gardin but not [Owens].

The judge explicated his belief:

In short, I don't see where [Owens] has shown that he had a legitimate or reasonable expectation of privacy in the area that was searched here, which was Miss Gardin's apartment. When she gave permission to search, she didn't give permission to search part of her apartment, she gave permission to search the whole apartment and they had the right to search. They could look in bureau drawers, they could lift the mattress and look under the mattress; they could look under the beds; they could look in containers. If there were ten containers there, they

didn't have permission to search seven containers but not these three.

The judge exclaimed:

It would be a fine how-do-you-do if you could simply stick a label on a suitcase and create an expectation of privacy. Then all the person would have to do would be to stick someone else's name on the container where they kept anything that was illegal and the police couldn't enter or look in that container because it would appear to the police that somebody else had a proprietary interest in it. I think that is a very tortured interpretation that you try to invest some reasonable legitimate expectation of privacy in that suitcase the way this person handled it in this case.

The judge "specifically" found that Owens did not have standing to object, but, "for purposes of decision," he assumed that Owens did have standing. Even on that assumption, however, the judge reached the same conclusion:

No personal Fourth Amendment right of [Owens] was violated when the police have the consent to search her apartment and everything therein.

The judge denied the motion to suppress.

### III

Owens's petition for a writ of certiorari presented one question:

Did the trial court err in holding that [Owens] had neither standing to contest a search of, nor a reasonable expectation of privacy in, a piece of luggage he placed in a friend's living room, temporarily?

### A

[A]s a general proposition, the issue of standing involves two inquiries: first, whether the proponent of a

particular legal right has alleged "injury in fact," and, second, whether the proponent is asserting his own legal rights and interests rather than basing his claim of relief upon the rights of third parties.

*Rakas v. Illinois,* 439 U.S. 128, 139, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978) (citations omitted). The Court made clear that it was not casting "the least doubt" on cases which recognize this general proposition. *Id.* "But," the Court asserted,

> this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

*Id.* at 140, 99 S.Ct. at 428. "Analyzed in these terms," the Court explained,

> the question is whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it.

*Id.* "That inquiry," the Court continued,

> in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect.

*Id.* "In defining the scope of that interest, ... arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." *Id.* at 143, 99 S.Ct. at 430. The interest, therefore, does not depend upon a property right in the place or item invaded, but in a legitimate expectation of privacy in the place or item. *Id.* Mr. Justice Powell, joined by Chief Justice Burger, observed in his concurring opinion in *Rakas,* that this view is

a sounder standard for determining the scope of a person's Fourth Amendment rights: Only legitimate expectations of privacy are protected by the Constitution.

*Id.* at 151, 99 S.Ct. at 434. In *United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980), the Court

> reaffirmed the established rule that a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights.

"And," the Court stated,

> the defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party.

*Id.* (emphasis in original). An expectation of privacy may be subjective, and it is legitimate if it is one that society is prepared to recognize as reasonable. *Minnesota v. Olson*, 495 U.S. ——, ——, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990).

### B

■ As we have seen, the hearing judge found that the "exclusive and sole right in that apartment respecting the Fourth Amendment rights" was in Gardin. Although Owens claimed that he spent the night in the apartment preceding the appearance of the police, Gardin said that he had not. The hearing judge, performing his function to judge the credibility of the witnesses, resolved the contrariant testimonies. He obviously believed Gardin. When the judge said that Owens and his companions

> come up here from Florida and flop their suitcases down in Miss Gardin's apartment without any arrangements whatsoever ... they flop their suitcases in there and go off, intending to return hours or days later, ...

the clear import was that the judge thought that Owens had not, in fact, spent the night in Gardin's apartment. This judgment on the evidence was not clearly erroneous. Md.

Rule 8–131(c). Therefore, we accept that Owens did not enjoy the status of an overnight guest which "alone [would have been] enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Minnesota v. Olson,* 110 S.Ct. at 1688. Owens had no other claim to an expectation of privacy with respect to the premises. He was not a guest of Gardin, paying or free. He did not have a key to the premises. He could lawfully enter the apartment only with Gardin's permission; he had no authority to come and go as he pleased. Gardin had complete dominion and control over the apartment and could exclude others, including Owens, from it. This dominion and control was not shared by Owens.

■ On our independent constitutional appraisal of the record, *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990), we hold that, in the circumstances here, Gardin's Fourth Amendment rights, not those of Owens, would be violated by an invalid search of the apartment. The relationship between Owens and Gardin and the apartment did not give rise to such an expectation of privacy in the apartment, so far as Owens was concerned, that "society is prepared to recognize as 'reasonable.' " *Olson,* 110 S.Ct. at 1687. The officers were lawfully on the premises. Gardin's consent to a search of her apartment was valid. Owens's luggage was in plain view. He had no legitimate expectation of privacy in the apartment. It follows that, in those circumstances, the mere observation of the bag did not offend the Fourth Amendment. Therefore, the bag was lawfully in the hands of the officers. The question is whether the officers could then forthwith search the bag without impinging on Owens's Fourth Amendment rights.

## C

■ We bear in mind that it is not a "place" which is constitutionally protected against unreasonable searches and seizures.

For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in

his own home or office, is not a subject of Fourth Amendment protection.

*Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).

But what [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Id.* at 351–352, 88 S.Ct. at 511. The apartment was accessible at the whim of Gardin, so, as far as Owens was concerned, the apartment was accessible to the public. He had no control whatsoever over whom Gardin permitted to enter the apartment, and the record contains no indication that he requested that she restrict access to the premises. It does not follow, however, that, therefore, Owens had no legitimate expectation of privacy in the contents of the bag.

It has been long established that

[j]ust as the Fourth Amendment "protects people, not places," the protections a judicial warrant offers against erroneous governmental intrusions are effective whether applied in or out of the home.

*United States v. Chadwick,* 433 U.S. 1, 9–10, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977). Over a century ago the Court included within the reach of the Warrant Clause printed matter travelling through the mails within the United States. *Ex parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1878). In *Chadwick,* 433 U.S. at 10, 97 S.Ct. at 2483, the Court noted that it "reaffirmed *Jackson* in *United States v. Van Leeuwen,* 397 U.S. 249 [90 S.Ct. 1029, 25 L.Ed.2d 282] (1970), where a search warrant was obtained to open two packages which, on mailing, the sender had declared contained only coins." The Court went on to point out:

Judicial warrants have been required for other searches conducted outside the home. *E.g., Katz v. United States,* 389 U.S. 347 [88 S.Ct. 507, 19 L.Ed.2d 576] (1967) (electronic interception of conversation in public telephone booth); *Coolidge v. New Hampshire,* 403 U.S. 443 [91 S.Ct. 2022, 29 L.Ed.2d 564] (1971) (automobile on private

premises); *Preston v. United States,* 376 U.S. 364 [84 S.Ct. 881, 11 L.Ed.2d 777] (1964) (automobile in custody); *United States v. Jeffers,* 342 U.S. 48 [72 S.Ct. 93, 96 L.Ed. 59] (1951) (hotel room); *G.M. Leasing Corp. v. United States,* 429 U.S. 338 [97 S.Ct. 619, 50 L.Ed.2d 530] (1977) (office); *Mancusi v. DeForte,* 392 U.S. 364 [88 S.Ct. 2120, 20 L.Ed.2d 1154] (1968) (office).

*Chadwick,* 433 U.S. at 10–11, 97 S.Ct. at 2483. Those cases, the Court stated, "reflect the settled constitutional principle ... that a fundamental purpose of the Fourth Amendment is to safeguard individuals from unreasonable government invasions of legitimate privacy interests, and not simply those interests found inside the four walls of the home." [1] *Id.* at 11, 97 S.Ct. at 2483. In *Chadwick,* personal effects were placed inside a double-locked footlocker. The Court declared that this "manifested an expectation that the contents would remain free from public examination." *Id.* It explained, "No less than one who locks the doors of his home against intruders, one who safeguards his personal possessions in this manner is due the protection of the Fourth Amendment Warrant Clause." *Id.* The Court refused to extend the rationale of its automobile search cases to warrantless searches of luggage. It expressed the view that "[i]n sum, a person's expectations of privacy in personal luggage are substantially greater than in an automobile." *Id.* at 13, 97 S.Ct. at 2484. Nor did "the footlocker's mobility justify dispensing with the added protections of the Warrant Clause." *Id. See also Arkansas v. Sanders,* 442 U.S. at 763–764, 99 S.Ct. at 2592–2593. The Court noted that the owners'

> principal privacy interest in the footlocker was, of course, not in the container itself, which was exposed to public view, but in its contents. A search of the interior was

---

1. "This is not to say," the Court warned, "that the Fourth Amendment translates precisely into a constitutional privacy right." *United States v. Chadwick,* 433 U.S. 1, 11, n. 6, 97 S.Ct. 2476, 2483, n. 6, 53 L.Ed.2d 538 (1977).

therefore a far greater intrusion into Fourth Amendment values than the impoundment of the footlocker.

*Chadwick,* 433 U.S. at 13–14, n. 8, 97 S.Ct. at 2485, n. 8. The Court explained:

> Though surely a substantial infringement of [the owners'] use and possession, the seizure did not diminish [the owners'] legitimate expectation that the footlocker's contents would remain private.

*Id.* In *Sanders,* the Court affirmed the view expressed in *Chadwick* and applied it to an unlocked suitcase containing marihuana. Furthermore, the Court declaimed:

> In the ordinary case ... a search of private property must be both reasonable and pursuant to a properly issued search warrant.

442 U.S. at 758, 99 S.Ct. at 2590. The Court declared:

> The mere reasonableness of a search, assessed in the light of the surrounding circumstances, is not a substitute for the judicial warrant required under the Fourth Amendment.

*Id.*

We hold that Owens had an expectation of privacy in the bag which society is prepared to recognize as reasonable. As the hearing court suggested, the circumstances under which Owens left the bag in the apartment may be likened to a gratuitous bailment. LaFave, *Search and Seizure* (1987 ed.) § 11.3(c) at 305, stated that such view "would seem to square with the *Mancusi* [*v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) ] expectation-of-privacy test." *Compare Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). But *see,* LaFave, *id.* at 312. There is an expectation of privacy because the bailor has sought to maintain the security and privacy of his effects in a place he regarded as a safe place for storage. LaFave points out, "Mere concealment of goods on the premises of another by trespass would not suffice, and of course the defendant must not have sold or otherwise abandoned his interest in those goods." § 11.3(c)

at 305–306.[2]  As was noted in *Sanders,* 442 U.S. at 762, 99 S.Ct. at 2592 and in *Chadwick,* 433 U.S. at 13, 97 S.Ct. at 2484, and *United States v. Block,* 590 F.2d 535, 541 (4th Cir.1978), luggage is a common repository for one's personal effects, and, therefore, is inevitably associated with the expectation of privacy.  The bag here was zippered closed, and its contents were not exposed to public view.  Both Owens and Gardin testified that Owens had not given Gardin permission to open the bag.  The testimony of the police officers did not conflict with their testimony on that point.  There was a tag affixed to the bag bearing Owens's name and address, making known that it was his private property.  Nevertheless, the police opened the bag forthwith and seized its contents.  This action, not supported by a warrant based on probable cause, violated Owens's rights under the Fourth Amendment.  As we have seen, the consent by Gardin to a search of her apartment empowered the police to seize the bag.  Ordinarily, the police could not search Owens's bag without the authorization of a search warrant.  But Gardin's consent intervened.  Gardin forewent her Fourth Amendment rights as to her apartment by consenting to the search.  Our inquiry proceeds to whether her consent carried over to Owens with respect to the contents of the bag he left in her apartment.

## IV

As we have seen, the Supreme Court has made clear that a search or seizure conducted without the benefit of a warrant supported by probable cause is per se unreasonable

---

**2.**  There is no suggestion that Owens had sold the crack and the State conceded that there was no "issue of abandonment here."  The prosecutor told the court:

I think if we get beyond the issue of standing [of Owens to object] then we come to the fundamental issue—is there reasonable expectation of privacy under the facts and circumstances which are before the court.

For a discussion of abandonment and the Fourth Amendment, *see Duncan and Smith v. State,* 281 Md. 247, 261–263, 378 A.2d 1108 (1977).

under the Fourth Amendment, subject to only a few exceptions. *Gamble v. State*, 318 Md. at 123, 567 A.2d 95.

"But it is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."

*Id.*, quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–2044, 36 L.Ed.2d 854, 858 (1973). *See Doering v. State*, 313 Md. 384, 401–402, 545 A.2d 1281 (1988). "The burden of proving that the consent was freely and voluntarily given is upon the State." *Id.* at 401, 545 A.2d 1281.

[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that the consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.

*United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). *See Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

Without the presence of the exception of consent, the warrantless search was invalid. Owens was not even present. No exigent circumstances justified the search. There was no potential danger to the officers calling for an immediate search, and not the slightest chance that the contents of the bag could be removed before a warrant was obtained. Even though the police may have had ample probable cause to believe that the luggage contained contraband, as was also the case in *Sanders*, "[w]ith the [bag] safely immobilized, it was unreasonable to undertake the additional and greater intrusion of a search without a warrant." *Chadwick*, 433 U.S. at 13, 97 S.Ct. at 2485. Of course, it was more convenient for the officers to search the bag then and there, but convenience is not the criterion by which the Fourth Amendment is tested.

The judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral [judicial officer], which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer "engaged in the often competitive enterprise of ferreting out crime."

*Id.* at 9, 97 S.Ct. at 2482, quoting *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

The bottom line is that the State did not meet its burden of proving that Owens consented to the search of his bag. Gardin did not possess common authority over Owens's bag and had no other sufficient relationship to its contents to validate any consent by her to search the bag. We hold that, in the circumstances, the warrantless search of Owens's luggage was unreasonable and, therefore, violated his Fourth Amendment rights. Thus, the denial of the motion to suppress was prejudicially erroneous and entitles Owens to a new trial.

Searches and seizures deeply concerned the colonists. Their concern grew in large measure out of their experience with writs of assistance and their memories of the general warrants used in England. It was clear to the Supreme Court, however, that the "Framers [of the Constitution] were men who focused on the wrongs of that day but who intended the Fourth Amendment to safeguard fundamental values which would far outlast the specific abuses which gave it birth." *Chadwick,* 433 U.S. at 9, 97 S.Ct. at 2482. We are well aware, as is the Supreme Court, that

[e]ach time the exclusionary rule is applied it exacts a substantial social cost for the vindication of Fourth Amendment rights. Relevant and reliable evidence is kept from the trier of fact and the search for truth at trial is deflected.

*Rakas,* 439 U.S. at 137, 99 S.Ct. at 427. But in order to safeguard that most fundamental value of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," it is sometimes necessary that the scoundrel go free. This is

apparent from the many cases concerned with the Fourth Amendment in which the courts were faced with the dilemma of the rights of the individual vis-á-vis the interests of society.

Although the general principles applicable to claims of Fourth Amendment violations are well settled, litigation over requests for suppression of highly relevant evidence continues to occupy much of the attention of courts at all levels of the state and federal judiciary. Courts and law enforcement officials often find it difficult to discern the proper application of these principles to individual cases, because the circumstances giving rise to suppression requests can vary almost infinitely. Moreover, an apparently small difference in the factual situation frequently is viewed as a controlling difference in determining Fourth Amendment rights.

*Sanders*, 442 U.S. at 757, 99 S.Ct. at 2589. The evidence, showing that Owens possessed cocaine, if admissible, was legally sufficient to establish that he was a lawbreaker. Under our system of criminal justice, however, he may not be convicted and punished upon evidence obtained by enforcement authorities contrary to the Fourth Amendment. The end cannot justify the means. It is not controlling that *what* was found was unlawful; but it is decisive that *how* it was found was unconstitutional. Were it otherwise, the guarantee of the Fourth Amendment would be rendered meaningless, and the integrity of our system of criminal justice of which we are justly proud, would be despoiled.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTION TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AND TO REMAND THE CASE TO THE LATTER COURT FOR A NEW TRIAL; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY WASHINGTON COUNTY.

CHASANOW, J., dissents in which RODOWSKY and MARVIN H. SMITH, J., join.

CHASANOW, J., dissenting.

The majority holds that a drug dealer who leaves an unlocked bag containing over $75,000 worth of drugs at the home of a "friend" is the victim of an unlawful search when the friend authorizes the police to determine whether there are drugs on her premises. I would affirm the trial judge's ruling that the search was valid for any or all of the following reasons: First, Ms. Gardin could give valid consent to a search of the bag. Second, even if Ms. Gardin lacked actual authority to consent to the search of the bag, the police acted reasonably when they searched based on Ms. Gardin's apparent authority to consent. Third, under the circumstances in the instant case, Owens had no reasonable and legitimate expectation of privacy in the bag.

## I. MS. GARDIN'S CONSENT

We should affirm the trial judge's holding that Ms. Gardin had the authority to consent to a search of this bag. The bag was left unlocked in Ms. Gardin's exclusive possession. It could be opened by simply unzipping a zipper. Ms. Gardin was never told she should not open the bag. She had no indication of when Owens would retrieve the bag, and the bag was not even accessible to Owens unless Ms. Gardin allowed him into her home.

In *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249–50 (1974), a case involving consent to search given by a woman with whom the accused lived, the Supreme Court held that a third party may consent to a warrantless search where the third party possesses "common authority over or other sufficient relationship to the premises or effects sought to be inspected." Thus, a host, as the person who has the primary right of occupancy of the premises, may consent to a search of the area occupied by a guest over which he or she has common authority. *United States v. Buckles*, 495 F.2d 1377, 1381 (8th Cir.1974). In *Buckles*, the host validly consented to a search of her home, including the search of a jacket found

therein that belonged to her guest, the defendant. Similarly, in *State v. Martin,* 261 N.W.2d 341 (Minn.1977), the search of a closed tackle box was deemed proper. Martin, by virtue of his status as a guest, had "no reasonable expectation of privacy viz-a-viz [the host] as to any items he left in her apartment. Thus as long as the tackle box was in her apartment she could validly consent to its search." *Id.* at 344. In addition, see *United States v. Miroff,* 606 F.2d 777 (7th Cir.1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980), where the hosts validly consented to a search of their home, including a room temporarily occupied by guests. Police found stolen goods in shopping bags and in a closed garment bag belonging to the guests. The court noted that the hosts had previously requested of their guests that no stolen property be brought into their home and they were so assured. The guests were found to have "assumed the risk that one with whom they shared the common area might properly permit that common area to be searched, particularly when the sharer was the dominant or controlling party in the general premises." *Id.* at 779. *See also United States v. Carter,* 569 F.2d 801, 805 (4th Cir. 1977), *cert. denied,* 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978) (defendant's employer and owner of truck validly consented to search where police found gun wrapped in a coat liner behind seat; "it was reasonable to recognize that [the owner] had the right to permit inspection and that Carter had assumed the risk that [he] might so do").

I believe that the search of Owens's bag was not violative of his Fourth Amendment rights. Ms. Gardin had sole authority and control over the bag when the police confronted her with their suspicion that contraband was in her home. She should be able to consent to the seizure and search of a bag left in her living room. See *United States v. Falcon,* 766 F.2d 1469 (10th Cir.1985), where defendant's brother validly consented to a search of the premises, that consent extended to the playing by law enforcement officials of a cassette tape labelled " 'Confidential, Do Not

Play.'" The court concluded that the labelling evinced the defendant's

> "subjective expectation that what was on the tape would be safe from inspection by his brother or anyone his brother might permit to listen to it. That expectation, however, was objectively unreasonable. The tape was not locked away, hidden or sealed.... [His brother's] access to and control over the tape was absolute. He could have played it at any time.... We hold that, once the agents were justified in seizing the tape, no additional authority was necessary for the agents to play the tape."

*Id.* at 1476. *See also White v. United States*, 444 F.2d 724 (10th Cir.1971) (co-occupant of motel room had authority to consent to search of defendant's zippered bag). Owens had no access to the apartment or to the bag within the apartment, except with the permission of Gardin. Owens's bag was left unattended and unlocked. Gardin could have opened it herself or allowed anyone else to do so. The 7th Circuit Court of Appeals grappled with a similar situation in *U.S. v. D'Antoni*, 856 F.2d 975 (7th Cir.1988). The court concluded:

> "The defendant had moved his belongings into the apartment[ ] essentially for storage.... It is reasonable to believe that during this time the residents of the apartment who paid the rent and, it appears, were there continuously, could have found it necessary to move the defendant's belongings for a variety of reasons convenient to them. Had the defendant been concerned about the inviolability of his possessions he would not have left them unattended and unsecured. We believe that the residents of the apartment were fully able to consent to a search of the entire premises, including the bedroom where the defendant occasionally stayed."

*Id.* at 983.

In addition, Ms. Gardin was at most a gratuitous bailee. She should have the right to rescind that bailment when told by the police that someone may have secreted drugs in her apartment. After being notified by the police that they

believed drugs had been left in her apartment, if Ms. Gardin did not take some affirmative action, she may thereafter be an accomplice in the possession of these drugs. It is only reasonable that Ms. Gardin should be able to demonstrate her innocence by authorizing the police to ascertain whether, in fact, there were drugs in her apartment and, if so, to remove them. She has the sole and exclusive possessory right in the apartment and a legitimate interest in defending the integrity of her home. People should not be expected to subject themselves to potential criminal penalties for knowingly possessing contraband after being put on notice by the police that a bag left in their house by a casual friend is believed to contain drugs. It is reasonable to expect that they would authorize, if not insist on, a search of the bag and removal of controlled dangerous substances.

## II. POLICE COULD REASONABLY RELY ON MS. GARDIN'S CONSENT

The police acted reasonably in searching the bag based on Ms. Gardin's consent. Ms. Gardin was left in the sole and exclusive possession of an unlocked zippered bag. Although acknowledging that the bag was left with her by someone else, Ms. Gardin freely consented to its search. She never indicated either a reluctance to consent or the lack of authority to consent to the search. The police were reasonable in assuming that she had authority to open the unlocked bag or to consent to its search to determine whether she was the unwitting and unwilling repository of contraband. When Ms. Gardin learned of the police suspicion that the bag contained drugs, she could have removed the suspect bag from her apartment. Likewise, she could have demanded that the police remove the offending bag. Under the circumstances of this case, the police were entitled to assume she could authorize the search of the bag. The trial judge was not in error in finding that, since the bag was in Ms. Gardin's living room, in her exclusive possession, and secured only by a zipper, she had sufficient indicia of joint control over the bag to authorize its search.

Where the police reasonably, although incorrectly, believe that a third party has the authority to consent to a search, the search will nevertheless be upheld because the officers' actions in relying on such authority were reasonable. *Illinois v. Rodriguez*, 497 U.S. ——, ——, 110 S.Ct. 2793, 2800–01, 111 L.Ed.2d 148, 160–61 (1990). See also *White v. United States, supra*, where woman consenting to search held herself out as defendant's wife and, thus, police reasonably believed she could consent to search.

In *United States v. Hamilton*, 792 F.2d 837 (9th Cir. 1986), a mobile home was parked in the driveway of a house and attached to the house by an electrical cord. Agents asked for and obtained permission from the homeowner to search the mobile home. Actually, the mobile home belonged not to the homeowner, but to the homeowner's son. The 9th Circuit held that the agents could, in good faith, rely on the homeowner's apparent authority to consent to the search of the mobile home.

The Supreme Court in *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684, 694 (1969), refused to engage in "metaphysical subtleties" when a defendant argued that the third party who consented to the search of the defendant's entire duffel bag had actual permission to use only one compartment of the bag. The defendant was found to have "assumed the risk that [the third party] would allow someone else to look inside." *Id.* The Court's reasoning may be applied to the facts of the instant case. When Gardin consented to a search of her premises, the police were not required to engage in "metaphysical subtleties" in order to determine whether Gardin enjoyed unlimited access to the unlocked gym bag on the floor of her own living room. Gardin had apparent authority to consent to the search of Owens's bag, and the police acted reasonably when they searched based on her consent.

## III. EXPECTATION OF PRIVACY

The majority seems to summarily dismiss the fact that Ms. Gardin may have been given sufficient dominion or

control over the bag to be able to consent to a search. If so, her consent is valid regardless of any subjective expectation of privacy Owens may harbor. His expectation may be a factor in determining whether Ms. Gardin had sufficient authority to consent, but it is not controlling. It is acknowledged by the majority that "[a]n expectation of privacy . . . is legitimate if it is one that society is prepared to recognize as reasonable." 322 Md. 616, 626, 589 A.2d 59, 63; *Minnesota v. Olson,* 495 U.S. ——, ——, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85, 92 (1990). The majority, however, fails to consider that if the police search was based on a reasonable good faith belief that Ms. Gardin had the authority to consent, the search would be lawful regardless of whether she actually possessed the authority to consent, and regardless of any subjective expectation of privacy Owens may have harbored. *See Illinois v. Rodriguez,* 497 U.S. at ——, 110 S.Ct. at 2800–01, 111 L.Ed.2d at 159–61. In *Rodriguez,* the Court said, "what is at issue when a claim of apparent consent is raised is not whether the right to be free of searches has been *waived,* but whether the right to be free of *unreasonable* searches has been *violated."* (Emphasis in original.) *Id.* at ——, 110 S.Ct. at 2801, 111 L.Ed.2d at 161.

Owens's expectation of privacy is only relevant if Ms. Gardin could not validly consent to a search of Owens's bag or if the police could not reasonably rely on her apparent authority to consent. Even if there was no consent or no apparent authority to consent, I would find that Owens had no reasonable or justifiable expectation of privacy.

There is no question that current law generally provides one with an expectation of privacy in a bag, like the one in the instant case, even if it is unlocked. The police must have a search warrant before they may open it unless the search falls within one of the warrant requirement exceptions (*e.g.* consent). The expectation of privacy we protect, however, must be reasonable and legitimate. *Olson, supra.*

Mr. Owens's expectation of privacy should be examined based on the totality of circumstances surrounding his

leaving the bag with Ms. Gardin. That totality of circumstances should include such factors as the specific understanding between Owens and Ms. Gardin, the nature of their relationship, the nature of and security of the container, as well as Owens's knowledge about the contents of the bag. His knowledge of both the contents of the bag and the jeopardy in which he was placing Ms. Gardin by leaving the bag in her home are components of the expectation Owens should have about the security and privacy this unlocked bag would enjoy while in the custody of Ms. Gardin. It is not unreasonable to consider the contents in determining one's expectation of privacy in a container. For example, if one leaves a large box containing a dead body in the home of a friend, after the passage of time one should have no expectation of privacy in the contents, since a corpse may become quite malodorous and one should anticipate that the package may be opened to see what is causing the fetid aroma. In the instant case, the trial judge could properly have assumed Owens was aware of the contents of the bag he left in Ms. Gardin's exclusive custody and control. In this limited situation, it is Owens's action in depositing contraband, the possession of which is unlawful, with Ms. Gardin that placed her at risk of police scrutiny and possible arrest. Fundamental fairness requires that, if Owens placed Ms. Gardin at risk of being arrested for possession of the bag, she should be entitled to exonerate herself by assisting the police and authorizing a search of the bag. Society should expect, and Owens should expect, that if the police come to Ms. Gardin's home and express their suspicion that someone may have left drugs in her home, she would say, "Please look and see, and if someone has left drugs in my home take those drugs away." There is no good reason to elevate the privacy right of one who leaves an unlocked bag containing drugs in the home of a friend over the right of the friend to insure that his or her home is drug free. I believe society is not prepared to accept that Owens had a legitimate and reason-

able expectation of privacy when he left his bag of drugs in the home of a casual friend.

In *United States v. Botsch*, 364 F.2d 542 (2d Cir.1966), *cert. denied*, 386 U.S. 937, 87 S.Ct. 959, 17 L.Ed.2d 810 (1967), it was found that the custodian of a defendant's property may consent to a search to prove that he is not involved in illegal activity. "It would be a harsh doctrine, indeed, that would prevent an innocent pawn from removing the taint of suspicion which had been cast upon him by a defendant's cunning scheme." *Id.* at 548. Botsch was ordering merchandise and having it sent through the mail to a shack that he had rented from Stein. Unbeknownst to Stein, the merchandise was obtained by fraud. Botsch asked Stein to place the items inside the shack when they arrived, told him to use his key to open the door, and gave him money to pay the delivery charges. When the authorities told Stein of the suspected scheme, he gave them access to the shack. The court reasoned that "[b]ecause Stein's activities—though innocent—were inextricably intertwined with Botsch's alleged scheme and cast suspicion upon him, we believe his authorization of the inspection when viewed in its full context rendered the search reasonable." *Id.* at 548. An inculpable party who was simply "left holding the bag" should be able to consent to a seizure and/or search in order to clear his or her name. *See also United States v. Gargiso*, 456 F.2d 584, 587 (2d Cir.1972) (landlord who, along with all tenants in building, had access to basement area could allow a search for stolen goods in an effort to exculpate himself); *United States v. Jones*, 430 F.Supp. 219, 225 (W.D.Penn.1977), *aff'd*, 591 F.2d 1337 (3d Cir.1979) ("[p]ersons who are unwittingly thrust into the role of a participant in criminal activity may consent to a search of items which have been placed in their safekeeping in order to exculpate themselves from the alleged crime").

Had Owens locked his bag, he would have had a greater expectation of privacy. When a container is locked, some courts have held that the host may consent to the seizure of the guest's property, but the police, barring exigent circum-

stances, must obtain a warrant before opening the locked item and conducting an investigatory search. *United States v. Diggs,* 569 F.2d 1264, 1265 (3d Cir.1977) ("a gratuitous bailee of a locked box possibly containing contraband had a sufficient property interest in the box to surrender it to the authorities"); *see also United States v. Potamitis,* 564 F.Supp. 1484, 1488 (S.D.N.Y.1983), *aff'd,* 739 F.2d 784 (2d Cir.), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269, *cert. denied sub nom.,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984) (third party delivered locked footlocker to FBI, who then obtained a search warrant and opened the locker; "a person who has been duped into holding stolen property has the right promptly to establish his innocent role in the transaction and to exculpate himself by voluntarily delivering the contraband to the authorities"). In *Gieffels v. State,* 590 P.2d 55 (Alaska 1979), a gratuitous bailee permitted the police to seize the defendant's suitcase. The court did not have to determine whether the police could also search the suitcase, since the search was conducted pursuant to a search warrant, but the court stated that the bailee's "right to exculpate himself and to avoid any possible involvement in the crime charged outweighed Gieffels' right to have the privacy of his property protected." *Id.* at 62.

People who come to suspect the presence of drugs in their homes should be expected to and have the right to enlist police assistance in ensuring that their premises are drug free. This right should transcend any expectations of privacy by someone who exposes a friend to criminal liability by leaving an unlocked bag of drugs in the home of that friend.

I would affirm the conviction. Judges RODOWSKY and SMITH have authorized me to state that they concur with the views expressed herein.